U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

2016 JUL 28  PM 1:43

OFFICE OF THE CLERK

# UNITED STATES DISTRICT COURT
## FOR THE STATE OF NEBRASKA,  LINCOLN DIVISION

| | |
|---|---|
| LISA NELSON, personally and as ) <br> assignee of claims belonging to the <br> Shanandoah Trust,  H. Telford ) <br> personally and as assignee <br> to the claims of Marti Lundahl ) | |
| ) | **NOTICE OF REMOVAL** |
| Plaintiffs | (Madison  County, Nebraska |
| ) | Case no. CI 16-262 ) |
| ) | CIVIL NO.  8:16CV 368 |
| MOUNTAIN WEST FARM BUREAU <br> MUTUAL INSURANCE COMPANY;  ) <br> JEFFREY A. DONNELL; GEORGE E. <br> POWERS;  LAW  OFFICES  OF ) <br> SUNDAHL, POWERS,  KAPP  & <br> MARTIN, D. CHRISTINSEN, U.S. ) <br> POSTAL EMPLOYEES  SUSAN <br> AUKEMA AND  PAMELLA  GEE ) <br> and DOES 1- 10  Defendants | |
| ) | |
| Defendants | |
| _____ ) | |

PLEASE TAKEN NOTICE THAT,  pursuant to 28 USC Sections 1331,

1441(a), and 1446,  Defendant  D. CHRISTINSEN hereby removes the state action

Lisa Nelson,  et al. v. Mountain West Farm  Bureau  Mutual Insurance Company, et.al.

Madison County Nebraska case no.  CI 16-262,  to the United Stated District Court for

the state of Nebraska,  Omaha Division on the following grounds:

1.    Plaintiff's complaint was filed on June 16, 2016.  The complaint was amended on July 5, 2016.  This defendant was served with the summons and First Amended Complaint on July 23, 2016.  This defendant is unaware of any other defendant having been served process in this case or having made an appearance herein. Accordingly Defendant D. Christinsen now removes this action to the district court within 30 day period provided for in 1446.

2.    Plaintiff's First Amended Complaint states several federal questions claims under :  the Fair Housing Act;  the Federal Civil Rights Act;    and Ex Parte Young  and RICO  over which this court has original jurisdiction.

3.    Defendant is a Nebraska resident and hereby makes her general appearance in this action.

4.    Attached hereto as exhibit "1" is the complaint  served upon Defendant with attached exhibits on July 23, 2016 along with the attached 6 exhibits.

Dated:   July 23, 2016

D. Christinsen
710  South 13th St. #900
PMB #170
Norfolk, NE 68701

LISA NELSON. personally
assignee of the claims of
the Shanandoah Trust
229 N. Pine Street
Gordon, NE 69343
**(402) 413-5356**

H. Telford
935 Wilderness Trail
Green River, WY 82935
307-352-9577

IN THE MADISON COUNTY DISTRICT COURT
IN AND FOR THE STATE OF NEBRASKA

LISA NELSON, personally and as )
assignee of claims belonging to the
Shanandoah Trust, H. Lundahl )
Telford personally and as assignee
to the claims of Marti Lundahl )

Plaintiff )

       vs. )

MOUNTAIN WEST FARM )
BUREAU MUTUAL
INSURANCE COMPANY; )
JEFFREY A. DONNELL;
GEORGE E. POWERS, LAW )
OFFICES OF SUNDAHL,
POWERS, KAPP & MARTIN; )
D. CHRISTINSEN, U.S. POSTAL
EMPLOYEES SUSAN
AUKEMA AND PAMELLA GEE )
and DOES 1- 10
    Defendants )

Civil No. CI 16-262

FIRST AMENDED COMPLAINT

    COMES NOW LISA NELSON, trustee and assignee to the claims of the Shanandoah trust and H. LUNDAHL TELFORD personally and as assignee to the claims of Marti Lundahl to hereby file this complaint against the Defendants collectively in the state of Nebraska where the Trust is administered pursuant to Neb. Rev. Stat. §§ 30-2803, 30-2804. The home herein was a residential asset for the Shenandoah Trust and formerly provided a residence

$\text{\\} \quad ( \quad // \quad 1$

for disabled and protected beneficiaries  MARTI LUNDAHL  and H. LUNDAHL TELFORD "HLT" or "HOLLI".

## SUBJECT MATTER JURISDICTION

1.     This Court  has subject matter jurisdiction over the claims herein pursuant to the Federal Fair Housing Act;  Section 504 of the Rehabilitation Act,  title II of the ADA, the Federal Racketeering Act;  Bivens Constitutional Torts for First and Fourth Amendment violations, EX PARTE YOUNG prospective relief and Declaratory relief under Section 1983. Plaintiff also brings  state law causes of action for breach of contract;  Breach of the covenant of good faith and fair dealing; emotional distress, breach of the covenant of quiet enjoyment, and constructive trust.

## PERSONAL JURISDICTION

2.     West Farm Bureau Mutual Insurance Company "MWFBI",  is an homeowners insurance business  incorporated in  ALBANY County Wyoming.  Defendant Jeffrey A. Donnell is a state judge in Albany County Wyoming  and using his office as a criminal enterprise to collude with the Defendant Insurance Company, its attorneys and postal employees to commit violations of  section 504 of the RA and the Racketeering act.  Defendant DONNELL is only sued under EX PARTE YOUNG and for declaratory relief  under section 1983. Defendant POWERS and the law offices of SUNDAHL, POWERS, KAPP & MARTIN "SPKM" are attorneys and a lawfirm carrying our the illegal acts of their client the insurance company and the postal employees,  with the unauthorized blessing of the state court DONNELL.  Defendants AUKEMA and GEE sought to default Plaintiffs claims against the Defendants by intentionally obstructing Plaintiff's mail and thereby causing Plaintiff's default. GEE is additionally sued for fourth amendment violations for HOLLI's false detention when HOLLI complained.   Defendant CHRISTINSEN foreclosed on Plaintiff's lien against the property when he learned that MWFBI refused to pay for the losses.

## VENUE  JURISDICTION

3.     Venue lies in this jurisdiction pursuant to 18 USC section 1965,  42 USC sec. 3612(j)

(1) . . . any United States court  which the discriminatory housing practice is alleged

2

to have occurred **or in which any respondent resides or transacts business.**

Defendant resides in this jurisdiction

4.    This court also has venue jurisdiction under RICO, section 1965 and Venue for

any dispute regarding Trust assets is in the state of Nebraska pursuant to § 30-2808.

## GENERAL ALLEGATIONS

5.    Prohibited conduct under the Fair Housing regulations includes "[r]efusing to

provide  municipal services or property or hazard insurance" to a dwelling **and providing**

**services differently to a disabled person protected under the act.** 24 C.F.R. § **100.70(d)(4).**

Since HUD adopted the foregoing regulation,  courts have generally held that property and

liability insurance are "services" connected to the sale or rental of a dwelling (under FHA §

3604(b)) and that **withholding such insurance makes the dwelling "unavailable"** (under

FHA § 3604(a).) [1]

---

1    *E.g., N.A.A.C.P. v. American Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992) ("*NAACP*"); *Fuller v. Teachers Ins. Co.*, No. 5:06-CV-00438-F (E.D.N.C., Sept. 19, 2007); *National Fair Housing Alliance v. Prudential Ins. Co.*, 208 F.Supp.2d 46, 57 (D.D.C. 2002) ("*NFHA*"); *Strange v. Nationwide Mut. Ins. Co.*, 867 F.Supp. 1209 (E.D. Pa. 1994). See too **Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., 576 U.S. ___ (2015)** (Insurance companies that make a dwelling unavailable based on discriminatory purposes prohibited by the FHA can be held liable.); Jones v. Travelers Cas. Ins. Co. of Am., No. 13-CV-02390, 2013 WL 4511648 (N.D. Cal. Aug. 22, 2013) (insurer ended coverage for rental property upon discovering it housed Section 8 tenants, resulting in alleged disparate impact on the basis of race, sex, age, and familial status); Fuller v. Teachers Ins. Co., No. 06-cv-00438, 2007 WL 2746861 (E.D.N.C. Sept. 19, 2007) (denying motion to dismiss disparate impact claims based on insurer's cancellation of coverage for group home for people recovering from drug and alcohol addiction because of the unjustified adverse impact on individuals with mental and physical disabilities); **Wai v. Allstate Insurance Co, 75 F. Supp. 2d 1 (D.D.C. 1999) (**two landlords who rented their homes to people with disabilities were denied standard landlord insurance and were directed to purchase costlier commercial insurance policies.   The Court held that although insurance policies are not explicitly mentioned in the text of the FFHA, **denial of homeowners' insurance on the basis of disability violates §3604(f)(1),** which declares it unlawful to "otherwise make unavailable or deny, a dwelling to any buyer or renter because of handicap." **The court held that denial of insurance coverage would make a dwelling unavailable to the persons with disability and the insurer had to make a reasonable accommodation .)** ;  NAACP v. American Family Ins. CO.,      978 F.2d 287 (1992)(making insurance unavailable to dwellings for a discriminatory purpose violates the FHAA);  City of Edmonds, WA v.

3

6.    MEFBI  not  only  violated  the  terms of the insurance contract as shown infra but MWFBI  also  terminated  the  insurance contract in retaliation to the disabled Plaintiff's complaint to HUD.

7.    Specifically,  Plaintiff  Marti  Telford  is  declared  as disabled by the SSA bearing a diagnosis of invasive carcinoma stage III-B with secondary brain aneurysms. Plaintiff Holli Telford is Also declared disabled through the SSA with a diagnosis of primary Diastolic Congestive Heart Failure and malignant hypertension.   Persons declared disabled under the SSA are concluded protected persons under the Fair Housing Act and the ADA. Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 797 (1999).   The defendants were made aware of these diagnoses when Plaintiffs MARTI and HLT sought homeowners insurance from MWFBI; ultimately assigned policy no. 4HO82766.

8.    Sometime  at the end of  November of 2013 during  the Thanksgiving holidays, a substantial snowstorm hit plaintiff's Star Valley Ranch dwelling nearly burying HLT's truck in the driveway,  and  dropping enough snow to reach the height of  the  second Story balcony on the insured residence.   The heat from the inside of  MARTI and HLT's dwelling  pierced through the roof top converting the 4-5 foot snow drifts on the roof into ice sheets adhering to the rooftop. (See picture taken during a brief termination of the snow storm  as exhibit "1" attached hereto to give the snow claim  some scale.)  The snow continued to drop and convert to ice, until days later due to the tremendous weight of the snow and ice,  the house separated from the front balcony and the  home  which was supported by wooden columns (stilts)  on the basement ground floor,   sunk down approximately 1 foot due to the collapse of  several wooden columns and thus causing the home to shift forward. The only impediment keeping the home from crashing forward onto the inclined ground was  that the home was built around a 3

---

Oxford House, Inc. et. al. 514 U.S. 725 (1995)(Requiring owner to install sprinkling system in home housing drug addicts violated FHAA.); Nat'l. Fair Hous. Alliance v. Travelers Prop. Cas. Corp., No. 00-1506 (JR), at 1-2 (D.D.C. Jan. 9, 2001) (denying defendant's motion to dismiss in FHA race discrimination case against insurer); Lindsey v. Allstate Ins. Co., 34 F. Supp. 2d 636,  641-43 (W.D. Tenn. 1999) (finding that the FHA **prohibits discriminatory refusal to renew property insurance**);  Toledo Fair Housing Center. v. Nationwide Insurance 704 N.E.2d 667 (Ohio C.P. 1997)(alleging systematic racial discrimination  in the issuance of insurance.);

4

story concrete and cinder block fireplace comprising 1/3 the width of the storied home and preventing the home from projecting forward down the hill. When the home dropped 1 foot down onto the collapsed wooden supports, the dropping of the home caused all of the cold and hot water lines and the septic lines to accidently tear apart, the walls to separate and some of the electrical lines to breach. Sewage backed up into the home. Plaintiffs shut off the water values to the home but the pressurized water coming from the town still overflowed into the home between the shut off valves and the broken pipes in the home. Consequently Plaintiffs contacted the town of star valley and directed them to shut off the water feed from the town.

9.    Plaintiff Holli Telford subsequently sent Defendant a signed, sworn proof of loss as required under the "your duties" section of the policy. Plaintiff was advised that she needed to make the repairs first before being compensated. HOLLIE requested that MWFBI make an accommodation under the policy and a pay out of actual losses to the property within 10 days of the losses so that MARTI and HLT would not be displaced from their dwelling due to the lack of fundamental utilities. Furthermore, HOLLI indicated that the policy did not specifically identify when the actual losses would be paid and under what terms and certainly did not provide that the insured would be required to fund the repairs before being compensated. Nevertheless, PLAINTIFFS borrowed sufficient funds to have the home manually jacked up on the front end, temporary replacement stilts put in and the balcony reattached to provide a front cross support. However, the home is not level and you walk downhill when walking on the main floor level comprising of 675 square feet. In addition, Plaintiffs were unable to repair the septic issues because the septic tank was seemingly installed under the stilted home at the back. The home is on a significant incline. There is no crawl space on the backside of the home where the septic system reportedly lies. In order to repair the septic system, the home would have to be lifted by a crane and taller stilts put in to create a crawl space. Finally, Plaintiffs repaired the inside water lines but when she had the town turn the water lines back on, a break in the line could still be heard from the underground lines coming up through the basement into the home. Plaintiffs instructed the town to turn the water feed off until further notice for fear that the pressurized water from the town might create a potential mud slide that would further destabilize the foundational supports. to the

5

home. MWFBI's failure to reimburse Plaintiffs at all for any repairs caused construction to cease as occurred in some of the instances alleged in Valley Boys, Inc. v. State Farm Fire and Casualty Co., 8:14CV159 (D.Neb. 10/22/2014) attached hereto as exhibit "5".

10.    Plaintiff Holli Telford phoned the defendants on a number of occasions to address the losses and reimburse Plaintiffs for the "mitigation" repairs. MWFBI responded by reportedly increasing Plaintiff's insurance premiums mid term in January of 2014.

11.    On February 9, 2014, MWFBI terminated Plaintiff's policy for alleged failure to pay additional premiums over and above that promised in Plaintiff's declaration page.

12.    HLT emailed MWFBI several times during the months of February 2014 demanding that their policy be reinstated as MARTI and HLT's policy had been paid up through the advance date of March 9, 2014 and sent MWFBI calculations and canceled payments proving such. In numerous phone calls with MWFBI, HLT warned that she would sue MWFBI if MWFBI did not reimburse Plaintiff for their to date mitigation repairs and fund competent repairs to their dwelling. Given the property was an asset of the trust, assignee NELSON did open up a complaint with HUD in Nebraska including MARTI and HLT's FHA claims for MWFBI's failure to accommodate their policy provisions to make a pay out of actual losses to the property within 10 days of the losses so that MARTI and HLT would not be displaced from their dwelling due to the lack of fundamental utilities. HOLLI forwarded this HUD complaint to MWFBI. MWFBI's failure to accommodate their policy terms to meet Plaintiffs funding request and MWFBI's increasing premiums to Plaintiff's disabled household and terminating the policy was all pretextual and false.

13.    MWFBI never reinstated the policy and never reimbursed Plaintiff's for any repairs (even if to mitigate from further damages). Because there was no water or competent sewage services to the dwelling, Plaintiffs were forced to relocate to rental premises.

14.    MWFBI unilaterally upped Plaintiff's insurance premiums, terminated Plaintiff's insurance policy, refused to reimburse plaintiff for the performed mitigative repairs or any repairs for that matter,    and forced plaintiff out of their dwelling by making it uninhabitable and therefore unavailable to plaintiffs.    MWFBI's actions resulted in a constructive eviction of Plaintiffs.

6

15.    Plaintiffs relocated to competent rented premises. Again MWFBI failed to reimburse Plaintiffs for relocation costs.

16.    Before the 2 years to file an FHA complaint expired, Plaintiff HOLLIE and assignor MARTI opened an FHA action where MWFBI's principal offices were located in Albany County Wyoming as case 33719.

17.    Plaintiffs caused MWFBI to be properly served.

18.    After Plaintiff's filed the WYOMING action, they directed their mail be forwarded to another location in green river Wyoming, closer to a treatment facility for MARTI.

19.    When Plaintiffs had not heard back from MWFBI they contacted the court to learn if MWFBI had responded. The court clerk informed HOLLI that their mail was being returned to the court and that MWFBI had filed a response to Plaintiff's complaint. HLT gave the court clerk her new address by fax. HLT also appeared at the post office to inquire into why Plaintiff's forwarding mail service was being obstructed. Defendant GEE had HLT arrested for allegedly disturbing the peace to justify GEE's conduct of obstructing access to Plaintiffs mail and because HLT would appear on the premises with a video camera to videotape her appearances at the post office to exculpate HOLLI from any disturbing the peace charges. HLT filed an administrative claim with the post service paralegal AUKEMA regarding GEE's unlawful conduct and demanded that all survelliance evidence be preserved for a future action. Plaintiffs allege that 42 USC § 3611 of the fair housing act bars the postal service and all defendants from destroying evidence pertaining to a FAIR HOUSING claim by the following language:

> (2) Any person who, with intent thereby to mislead another person in an proceeding under this subchapter -
>   (A) makes or causes to be made any false entry or statement of fact in any report, account, record, or other document produced pursuant to subpoena or other lawful order under subsection (a) of this section;
>   (B) willfully neglects or fails to make or to cause to be made full, true, and correct entries in such reports, accounts, records, or other documents; or
>   (C) willfully mutilates, alters, or by any other means falsifies any documentary evidence; shall be fined not more than $100,000 or imprisoned not more than one year, or both.

7

This provision of the Fair Housing Act also models the witness tampering statute under RICO at 18 USC section 1512.

20.    During the coarse of the aforementioned events, HLT learned that MWFBI conspired with postal workers at the forwarding facility to obstruct Plaintiff's mail so that MWFBI could default Plaintiffs in the Wyoming litigation.

21.    In mid June, HLT called the court back shortly after learning of the returned mail and further learned that the court had scheduled a hearing for June 21, 2016 to discuss issues concerning Plaintiff's case. Plaintiffs appeared telephonically given they were located some 5 hours from the court. At the hearing, Defendant DONNELL immediately reprimanded Plaintiffs for Plaintiff's mail being returned to the court. When Plaintiffs explained the situation with the postal service and notified the court that they had filed a forwarding address with the court, the court threatened sanctions against Plaintiffs for the mail tampering acts taken by postal workers. In response, Plaintiffs demanded that they be served all process to their email account to avoid fraudulent default tactics being exercised by the opposing parties and their counsel through the aid of postal workers. DONNELL expressly rejected Plaintiffs motion for electronic service (even though the Wyoming rules of civil procedure provided this method of service in accordance with the demanding party's desire, not the court's discretion) – so that DONNELL could sustain a corrupt default against Plaintiffs when opposing counsel did not serve Plaintffs process but backed those services up by fraudulent certificates of service executed by opposing counsel's own staff.    After DONNELL expressed his willingness to violate the rules of civil procedure to Plaintiff's prejudice, Plaintiff's immediately demanded peremptory disqualification of DONNELL as permitted under WYOMING Rules of Civil Procedure Rule 40.1. DONNELL abruptly denied Plaintiff's disqualification request and then unilaterally and without notice disconnected Plaintiffs participation in the telephonic conference hearing causing HLT to call the court four more times and leave messages on the conference phone line demanding compliance with the rules of civil procedure by the court and all parties, else Plaintiffs would bring an ex parte young claims against the court.    While the conference was still proceeding ex parte and without Plaintiffs participation, Plaintiffs then obtained permission from the court clerk to fax file a written notice of change of address and peremptory disqualification to the court and did so fax

8

this 3 page motion to the court along with a photocopy of the check paying for the fax.   After the ex parte conference terminated,   DONNELL   directed the clerk to fax a document to Plaintiffs barring Plaintiff from filing any document by fax;   another violation of the rules of civil procedure.

22.   DONNELL never addressed Plaintiff's written demand for disqualification made before DONNELL executed an incompetent scheduling order in the case and forwarded that scheduling order to plaintiff HLT by mail. The scheduling order on its face is offensive to justice and unlawful.   Specifically,   the order demands that Plaintiffs provide expert witness statements and expert trial witnesses notifications proving up their disability status   by July 7, 2016.   It is common knowledge that expert witnesses charge at the very least 300 to 500 per hour and an up front retainer fee of no less then $3000 to provide any written statement concerning the disability of a party.   DONNELL issued this outrageous scheduling order knowing full well that Plaintiffs certified that they survived on exempted SSI income and would therefore not be able to financially obtain expert witnesses.   In addition,   DONNELL outrageously ordered that Plaintiffs undergo examinations by the defendant's expert witnesses by December of 2016 on disability diagnoses' that had already been long adjudicated in Plaintiff's favor by the SSA.   DONNELL's actions in whole violated the US Supreme Court rule set forth in Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 797 (1999) (Persons declared disabled under the SSA are concluded protected persons under the Fair Housing Act and the ADA.).   Hence since the SSA has declared HLT and MARTI disabled, then DONNELL had no authority under supreme court law to direct HLT and MARTI to expend non-existent financial resources to obtain expert medical witness statements or expert medical witnesses at trial to prove up their disability statuses, especially when sealed medical records could establish MARTI and HOLLI's disability statuses as a matter of fact and law and should automatically result in a stipulated facts to this effect under Cleveland supra.

23.   In addition,   defendant SPKM, who represents MWFBI, had personal knowledge of MARTI's serious disability issues because 1 month before they agreed to represent MWFBI in the Wyoming action,   MARTI through HOLLI petitioned SPKM to take on a medical malpractice case for MARTI against an HCA hospital in Utah who failed to

9

diagnose MARTI's cervical cancer in 2013 and which caused MARTI's present day permanent kidney, brain and other organ disabilities. HOLLI mailed SPKM, MARTI's hospital and doctor's records dating back to 2013 so that SPKM could do a work up on MARTI's malpractice claim for purposes of contingency representation. SPKM ultimately declined contingency representation for MARTI because SPKM learned that the HCA hospital had fabricated and/or doctored treatment records for MARTI to avoid MARTI's malpractice claim against HCA (Hospital Corporations of America). Because SPKM did not report the attorneys involved in the fabrication of treatment records for MARTI, SPKM therefore obviously endorses the fabrication or destruction of litigation records. Nevertheless, SPKM knew at the time they participated in the ex parte conference hearing with DONNELL that at the very least MARTI was clearly disabled under the parameters set forth by Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 797 (1999) because SPKM had MARTI's medical records in their possession. Accordingly, to petition for expert medical witness statements and expert medical witnesses at trial was clearly an abusive act of churning litigation to increase litigation costs and determined to be abusive and actionable by several federal courts under the RICO Act. See United States v. Mason, 26 F.3d 134 (9th Cir. 06/15/1994) (The . . .churning and prolongation of litigation, and other abusive litigation activities practiced by the Alliance . . . constituted acts of mail fraud.); CSX Transportation Inc. v. Robert Pierce, Atty, et al, no. 5:05-cv-00202-FPS (D.W.V. 2011) (ex. "2" attached); *Fireman's Fund Insurance Company v. Stites*, 258 F.3d 1016 (9th Cir. 2001) (ex. "4" attached) (delaying resolution of case in order to inflate legal fees. Citing United States v. Stites , 56 F.3d 1020, 1022 (9th Cir. 1995)); and Lydia Schweer Family Trust v. Dingler, the Hartford Insurance Company, 8:09-cv-2451 (M.D. FL (2010)(Churning illegal).

 24. Based on the foregoing, Plaintiffs therefore charge DONNELL with use of his office as a criminal enterprise to permit the insurance defendants (largely responsible for DONNELL's placement in judicial office) to commit acts of mail fraud in churning unauthorized litigation costs for the purpose of defrauding Plaintiffs of their money properties to pay for unnecessary medical expert. Plaintiff's further charge DONNELL, an absolutely immuned individual for aiding abetting mail fraud by the insurance defendants, achieved by

10

an unlawful order by DONNELL permitting the insurance defendants to file false certificates of service in the file claiming service of process upon Plaintiffs; fraudulent acts that can be avoided by emailed service of the process so that Plaintiffs and the court can be truthfully advised of process opposing counsel is actually serving upon plaintiffs. The objective of opposing counsel's false proofs of service is to default and defraud plaintiff's in the litigation of their causes of action. Attached hereto as exhibit "3" is Deck v. Engineered Laminates, 349 F3d 1253 (10th Cir. 2003), where the 10th Circuit foud such conduct to be actionable under the RICO statute. See also Exhibits 2-4 and 6 attached for other cases finding such actions stating mail fraud claims and  United States v. Mason, 26 F.3d 134 (9th Cir. 06/15/1994)  (The . . .churning and  prolongation of litigation, and other abusive litigation activities practiced by the Alliance . . .  constituted acts of mail fraud.). As admitted in exhibit "2" attached  CSX Transportation Inc. v. Robert Pierce, Atty, et al,  no. 5:05-cv-00202-FPS (D.W.V. 2011), the following allegations of the complaint ultimately supported a large racketeering verdict and a conviction:

1. The Defendants listed herein are well-organized and financed asbestos personal injury attorneys and purported medical experts who have orchestrated a scheme to inundate CSXT and other entities with asbestos cases without regard to their merit.

2. This case arises from the successful efforts of the Defendants to deliberately prosecute objectively unreasonable . . . asbestos claims against CSXT.

3. As will be explained more fully below, this conduct violated the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.,* and also supports claims for common law fraud and conspiracy.

18. As will be explained more fully below, this conduct violated the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*.

55. Corbitt's reckless and unlawful conduct resulted in chronically substandard x-rays that helped further the lawyer Defendants' scheme to defraud CSXT by diagnosing asbestos-related diseases where none in fact exist.

58. The lawyer Defendants most commonly also used Defendant Harron to read and interpret the x-rays generated during their screenings. (See Exhibit L 184:6-17.) Defendant Peirce has testified that he selected Harron based on his willingness to read an unusually high number of x-rays at a time and his willingness to be paid on a per x-ray, as opposed to hourly, basis. *(Id.; see also id.* 196:23-197:21.) This arrangement enhanced Defendant

11

Harron's financial incentive to read as many x-rays as possible without regard to established medical protocols.

59.    Based upon information and belief, however, Defendant Peirce and the other lawyer Defendants utilized Harron not only because of his speed and cost, but also because of his willingness to intentionally misrepresent or recklessly disregard the contents of the x-rays he reviewed and to identify signs of asbestos-related diseases where none in fact existed.

60.    Regardless of the exact percentage of films Harron read as positive for asbestosis, he generated an artificially high number of cases for the lawyer Defendants and knowingly and willingly ensured that healthy individuals would become asbestosis clients of the Peirce firm.

75.    Once the lawyer Defendants received a positive diagnosis from Defendant Harron or their other doctors, they continued upon a course of intentionally fraudulent and unlawful conduct to ensure that all claims, regardless of their objective merit and validity, were filed and settled.

Significantly, the requisite mailing or wiring need not itself contain any fraudulent information and may be entirely innocent. However, they must be shown to be at least a "step" in the scheme. (Schmuck v. United States, 489 U.S. 705, 712 [1989])

25.    Like the CSXT defendants, the insurance defendants herein hope to have their own medical experts disavow Plaintiff disability diagnoses that have been in place for years and which were made by appointed government specialists under the SSA. The US Supreme Court has prohibited such conduct of second guessing an SSA decision under the FHA. In addition, it is likely that the insurance defendant will achieve their fraud in the same manner as the CSXT defendants thus incorporating RICO into the action.

FIRST CAUSE OF ACTION
Federal Housing Act and Title III Violations against all defendants.
Except Against DONNELL for declaratory and injunctive relief only

26.    To succeed on an accommodation claim, plaintiff must prove FOUR elements: (1) they are a protected person, (2) they requested an accommodation; (3) the accommodation was denied and (4) a dwelling was made unavailable. *Andover Hous. Auth. v. Shkolnik*, 443 Mass 300, 315 (2005);   Title 42 U.S.C. § 3604(f)(3)(B) (it unlawful for any person or entity to refuse "to make reasonable accommodation **in rules, policies, practices, or services, when such accommodation may be necessary to** afford such person equal opportunity to use and enjoy a dwelling.");   *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 729, 115 S.Ct.

12

1776, 131 L.Ed.2d 801 (1995);  *DuBois v. Ass'n of Apart. Owners of 2987 Kalakaua,  453 F.3d 1175, 1179* (9th Cir. 2006);  *Bryant Woods Inn, Inc. v. Howard Cnty., Md.,* 124 F.3d 597, 603 (4th Cir. 1997);  *Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 336 (2d Cir. 1995).  *Calero-Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 25 (1st Cir. 2004);  Canady v. Prescott Canyon Estates Homeowners Association, 60 P.3d 231 (Ariz. Ct. App. 2002).

27.    In this case and contrary to the actions of the defendants,  plaintiffs do not need to prove that they are disabled persons under the act because they already have declarations by the SSA that they are disabled;  thus meeting the first element.    Plaintiffs requested an accommodation that they be paid immediately on an actual cost basis for  every repair made by plaintiffs.    The insurance defendants refused plaintiff's requested accommodation when the policy itself was silent regarding how the actual costs payments would be made.  Ultimately, the insurance company refused to accommodate plaintiffs in any manner including pay plaintiff's any mitigation damages to prevent further injury to the property.  Finally  because the insurance company failed to pay for covered perils involving the utilities to the home,  the home was made unavailable to plaintiffs and plaintiffs were forced to relocate.  Plaintiffs have met all of the elements for establishing an FHA claim against the defendants.

## SECOND  CAUSE OF ACTION
### Federal Racketeering Act Violations against  all defendants.
### Except  Against DONNELL  For Injunctive  Relief only

27.    Plaintiffs allege that defendants have colletively used the office of DONNELL to commit acts of mail and wire fraud.   To date,  the defendants purport to claim that they have mailed Plaintiffs no less than 17 documents;   all which Plaintiffs have not received. DONNELL is absolutely immuned from monetary damages but not prosepective equitable relief.   The defendants seek to defeat plaintiff's causes of action through their mail fraud.

28.    The Defendants also seek to deprive plaintiffs of money properties by requiring Plaintiffs to frivolously fund medical experts on disability adjudications that are the subject of collateral estoppel.  These acts constitute additional acts of mail fraud.

29.    Plaintiffs have been damages by the defendants actions.

13

THIRD CAUSE OF ACTION
BIVENS Violations against defendants GEE and AUKEMA

30.    GEE caused HOLLI to be arrested on several occassions when HOLLI complained about GEE tampering with HOLLI's mail. The local police physically removed HOLLI from the postal premises no less than 4 times for allegedly disturbing the peace but would not imprison HOLLI in jail because HOLLI filmed her appearances at the post office as exculpitory evidence.. Defendant AUKEMA was charged with responsibility of preserving the postal surveillance videotapes acting as the postal services charging evidence. AUKEMA as deliberately destroyed this evidence an order to continue the unlawful scheme of tampering with Plaintiff's mail in violation of HOLLI's First, Fourth and Fifth amendment rights. Plaintiff was damaged thereby.

FOURTH CAUSE OF ACTION
EX PARTE YOUNG and Section 1983 Declaratory Relief against DONNELL

31.    In **CROWE DUNLEVY V. STIDHAM,  640 F.3d 1140 (10th Cir. 2011)** citing *Verizon Md, Inc. v. Pub. Serv. Comm'n*,535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 87 (2002) and *Va. Office for Protection Advocacy v. Stewart*, ___U.S. ___, 131 S.Ct. 1632, 1638-39, ___ L.Ed.2d ___ (2011),  the Tenth Circuit affirmed that  a prayer for injunctive relief asking "that state official be restrained from enforcing an order in contravention of controlling federal law" satisfies *Verizon's* straight forward inquiry. *Verizon*, 535 U.S. At 645, 122 S.Ct. 1753.   *Verizon's* direction does not limit the *Ex parte Young* inquiry to whether federal constitutional or statutory law has been violated

32.    A plaintiff satisfies the irreparable harm requirement by showing "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.   "*RoDa Drilling Co. v. Siegal*, 552 F.2d 1203, 1210 (10th Cir. 2009) .   We agree with the district court that Crowe faces a significant risk of financial injury which, given the unique circumstances of this case, creates an irreparable harm sufficient to support a preliminary injunction. While economic loss is usually insufficient to constitute irreparable harm,  *Port City Props, v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008), the "[i]mposition of money damages that cannot later be recovered for reasons such as sovereign

14

immunity constitutes irreparable injury.  "*Edmondson*, 594 F.3d at 770-71; *see also Ohio Oil Co. v. Conway*, 279 U.S. 813, 814, 49 S.Ct. 256, 73 L.Ed. 972 (1929); *Kan. Health Care Ass'n Inc. v. Kan. Dep't of Soc. Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994).

33.    Here DONNELL is absolutely immuned for his conduct with respect to money damages but not equitable relief.   DONNELL has made a number of orders  with knowledge and intent of violating Plaintiff's federal constitutional rights with prospective harm to Plaintiffs.   Plaintiffs seek a declaratory decree that DONNNELL had violated  Plaintiff's constitutional rights and an injunction  enjoining future application of any order doing so  .

## FIFTH  CAUSE OF ACTION
### (Breach of Contract and of the Covenant of Good faith Fair dealing against the Insurance Defendants and Christinsen)

34.    Plaintiff  also  brings  state law causes of action for breach of contract and Breach of  the covenant of good faith and fair dealing and the Insurance Defendants.  Plaintiffs policy clearly did not include any terms as to when actual reimbursement payments were to be made. Every other policy has required these payments to be  paid before the work is done, not after.  Plaintiffs expended some of their personal funds to make mitigative repairs,  not having monies beyond that.    Plaintiffs were never reimbursed, The Insurance defendants followed none of the policy terms. In addition,  it appears by virtue of an answer filed in the Wyoming litigation,  that the insurance defendants destroyed HOLLI's notice of claim to time delay plaintiffs claim under a theory of latches.  These actions constitute a breach of the convenant of good faith and fair dealing.

35.    In addition,  Defendant Christinsen had no right to all in a lien against the property when the property was left disabled by the Insurance Company's failure to honor the insurance contract.  Christinsen's contract provided for no such remedy.

## SIXTH  CAUSE OF ACTION
### (Emotional Distress against all except DONNELL)

36.    Plaintiffs aver that they have suffered emotional harm.  Under  Wyoming law where the Plaintiff has been financially harmed by the Defendants actions,  the Defendants are

15

permitted to pursue an emotional distress claim.

### SEVENTH CAUSE OF ACTION
(Breach of the Covenant of Quiet Enjoyment  against all except DONNELL)

37.    Plaintiffs aver that the insurance defendants committed the breach of quiet enjoyment of Plaintiff's premises when they caused Plaintiffs' to be constructively evicted.

### EIGHTH CAUSE OF ACTION
(Constructive Trust Against the Insurance Defendants)

38.    Plaintiffs  seek constructive trust over all of their insurance proceeds.

WHEREFORE,  PLAINTIFFS pray as follows:

1.    For all compensatory, general and punitive damages as allowed by law;

2.    For all equitable and injunctive relief allowed by law;

3.    For Pre and post judgment interest;

4.    For Treble damages under the RICO claim.

5.    For  EX  PARTE  YOUNG  and  section  1983  declaratory  relief  against DONNNEL

6.    For trial by jury, and

7.    For all attorneys fees and court costs as allowed by law

8.    For other such relief as the court may allow;

Dated:  July 5, 2016

_____
Marti Lundahl

_____
Lisa Nelson

_____
Lundahl Telford

1



2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT WHEELING

CSX TRANSPORTATION, INC.,

      Plaintiff,

v.                            Civil Action No. 5:05-cv-202

ROBERT N. PEIRCE, JR.;
LOUIS A. RAIMOND;
MARK T. COULTER;
and RAY HARRON, M.D.,

      Defendants.

## THIRD AMENDED COMPLAINT

**NOW COMES** the Plaintiff, CSX Transportation, Inc. ("CSXT"), by and through counsel,

and for its Third Amended Complaint against the Defendants, Robert N. Peirce, Jr., Louis A.

Raimond, Mark T. Coulter, and Ray Harron, M.D., avers and states as follows:

### NATURE OF THE ACTION

1.    The Defendants listed herein are well-organized and financed asbestos personal

injury attorneys and purported medical experts who have orchestrated a scheme to inundate

CSXT and other entities with thousands of asbestos cases without regard to their merit.

2.    This case arises from the successful efforts of the Defendants to deliberately

fabricate and prosecute objectively unreasonable, false and fraudulent asbestos claims against

CSXT.

3.    As will be explained more fully below, this conduct violated the federal Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and also

supports claims for common law fraud and conspiracy.

### JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§1331 because the claims herein arise under the laws of the United States, pursuant to the

1

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1964(c), because the claims herein seek recovery for violations of 18 U.S.C. §1962, and pursuant to 28 U.S.C. §1332 because the action is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.     This Court also has subject matter jurisdiction over the common law claims asserted herein pursuant to 28 U.S.C. §1367(a), because those claims are so related to the claims arising under the law of the United States that they form part of the same case or controversy.

6.     This Court is a proper venue for this action under 28 U.S.C. §1391(a)(2) because a substantial part of the acts and omissions giving rise to this dispute occurred within this judicial district and division.

7.     The out-of-state Defendants further listed herein are also subject to this Court's jurisdiction pursuant to the provisions of West Virginia Code § 56-3-33(3) as their actions within this State caused tortious injury to Plaintiff CSXT.

### PARTIES

8.     Plaintiff CSXT is and was at all times relevant herein a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business in Jacksonville, Florida.

9.     Defendant Robert N. Peirce, Jr. ("Peirce") is and was at all times relevant herein a citizen and resident of Sewickley, Allegheny County, Pennsylvania, with his principal mailing address being 104 Fair Acres Drive, Sewickley, Pennsylvania 15143.

10.    Defendant Louis A. Raimond ("Raimond") is and was at all times relevant herein a citizen and resident of Sewickley, Allegheny County, Pennsylvania, with his principal mailing address being 1604 Fieldstone Lane, Sewickley, Pennsylvania 15143.

2

8:16-cv-00368-JMG-FG3 Doc # 1 Filed: 07/28/16 Page 24 of 84 - Page ID # 24
Case 5:05-cv-00202-FPS -JES Document 841-1 Filed 07/14/11 Page 4 of 41 PageID #:
13348

11. Defendant Mark T. Coulter ("Coulter") is and was at all times relevant herein a citizen and resident of Monroeville, Allegheny County, Pennsylvania, with his principal mailing address being 2079 Ramsey Road, Monroeville, Pennsylvania 15146.

12. The individual Defendants Peirce, Raimond and Coulter are hereinafter referred to collectively as "the lawyer Defendants."

13. The lawyer Defendants were at all times relevant herein partners, members or shareholders of, or otherwise employed by or associated with, the law firm Robert Peirce & Associates, P.C. ("the Peirce firm"), formerly known as Peirce, Raimond & Coulter, P.C.

14. The Peirce firm is and was at all times relevant herein a Pennsylvania Professional Corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania.

15. At all times relevant herein the Peirce firm was registered to conduct and did conduct business in the State of West Virginia under the name Robert Peirce and Associates, P.C. or as Peirce, Raimond and Coulter, P.C.

16. Upon information and belief Defendant Ray Harron, M.D. ("Harron") is and was at all times relevant herein a citizen and resident of Bridgeport, Harrison County, West Virginia, with his principal mailing address being 901 West Main Street, Bridgeport, West Virginia 26334.

## BACKGROUND

17. The Peirce firm initiates and prosecutes lawsuits against railroad carriers, including CSXT, on behalf of current and former employees alleging various personal injuries and occupational illnesses, including asbestosis.

18. Beginning in the late 1990s, the lawyer Defendants, collectively and in concert, embarked upon a calculated and deliberate strategy to participate in and conduct the affairs of the Peirce firm through a pattern and practice of unlawful conduct, including bribery, fraud, conspiracy, and racketeering.

3

19.     Specifically, the lawyer Defendants gained access to potential clients through unlawful means, retained clients and procured medical diagnoses for them through intentionally unreliable mass screenings, prosecuted clients' claims using dishonest, fraudulent, and deceptive tactics and, ultimately, fabricated and prosecuted asbestos claims with no basis in fact. Moreover, the lawyer Defendants deliberately filed the claims they manufactured in mass lawsuits in overburdened courts to deprive CSXT of access to meaningful discovery, which in turn concealed fraudulent claims and leveraged higher settlements based on the threat of mass trials.

## I.     THE LAWYER DEFENDANTS' FRAUDULENT CLAIMS MANUFACTURING SCHEME

### A.     Access to Potential Clients Through Improper and Unlawful Means

20.     Some or all rail labor unions confer "Designated Legal Counsel" status on select lawyers and advise their members to use those lawyers. Designated status is highly desirable for lawyers because it permits them or their representatives to attend union meetings and solicit clients.

21.     In the years prior to this lawsuit, one or more of the lawyer Defendants enjoyed designated counsel status with one or more rail labor unions and explicitly advertised this fact in connection with the Peirce firm's screenings. (See Advertisement for Screening (attached as Exhibit A).)

22.     In 2003, it became known that certain rail labor officials had been accepting unlawful cash payments from lawyers in exchange for designated counsel status. As a result of this scheme, the federal government indicted and convicted multiple union officials, including former union president Charles L. Little, who pled guilty to federal racketeering charges.

23.     On December 8, 2003, an article in the Pittsburgh Tribune-Review linked Defendant Peirce and Mr. Little, stating that Peirce "gave thousands of dollars in cash to transportation union officials who played a role in helping him attract legal work from union

4

members." (See Chris Osher, *Testimony Implicates Ex-Official*, Pittsburgh Tribune-Review, Dec. 8, 2003 (attached as Exhibit B).)

24.     Further, Defendant Peirce himself explicitly admits contributing a total of $15,000.00 in cash to Little's various election campaigns.   Defendant Raimond also admits contributing $5,000.00 to Mr. Little's campaigns. (See Def.'s Suppl. Answers to Pl.'s 1st Interrog., No. 2 (attached as Exhibit C).)

25.     In addition to these payments, the lawyer Defendants utilized retired railroad employees, many of whom formerly worked for CSXT, as "runners" or "investigators" to lure railroad workers to their mass screenings.

26.     A majority, if not all, of these runners/investigators had left employment claiming varying degrees of disability and were receiving disability payments from the Railroad Retirement Board ("RRB").

27.     The lawyer Defendants caused the Peirce firm to pay these runners/investigators calculated sums to ensure that they remained eligible for federal retirement benefits, and then further fraudulently compensated them through "fringe benefits" and "off the books" reimbursements.

28.     On February 24, 2011 the United States of America brought a civil action against one of the Peirce firm's former runners/investigators, Robert V. Gilkison, and his wife (collectively "the Gilkisons") "for engaging in a continuing fraudulent scheme through which they attained hundreds of thousands of dollars of disability payments to which they were not entitled." (See Complaint, *U.S. v. Gilkison*, Case No. 1:11-cv-112 at ¶ 1 (S.D. Ohio Feb. 24, 2011) (attached as Exhibit D).)

29.     In particular, the complaint alleged:

[The] scheme, which continued for over fifteen years, involved repeated false statements and omissions in communications to the RRB regarding the amount of earnings Mr. Gilkison received from two separate law firms. Despite telling the RRB that he received only $400 a month, Mr. Gilkison received hundreds, if not thousands, of dollars in additional compensation each month. These earnings,

5

had they been disclosed, would have disqualified Mr. Gilkison from receiving a disability annuity.***

In addition to $400 a month, the Gilkisons also earned the following from Law Firm B during the above-referenced period:

a. $300-400 monthly relating to Mr. Gilkison's health insurance;

b. $165-400 monthly relating to Ms. Gilkison's health insurance;

c. a fully-insured Cadillac, which Mr. Gilkison chose from the dealer and which he used for his primary personal vehicle;

d. a second fully-insured Cadillac, which Mr. Gilkison chose from the dealer to replace his earlier model and which he used for his primary personal vehicle;

e. payment for all car expenses, including gas, taxes, tags, oil, maintenance, insurance, tires, and car washes; and

f. $1,000 each month in cash for "auto allowance" from a three year period.

In addition to his $400 monthly salary, Mr. Gilkison received over $167,000 from Law Firm B in between 1997 and 2005, including over $96,000 for cash expenditures. In addition to the amounts referenced above, Mr. Gilkison's reimbursed cash and credit card expenditures included money for motel rooms, drinks, his home office, his car phone, and tickets for University of Kentucky basketball games and Cincinnati Bengals football games. For example, Mr. Gilkison received payments for $1,422 at the Beau Rivage Resort & Casino in Biloxi, Mississippi; $609 at a seafood restaurant in Williamsburg, Virginia; and $1,181.71 for a purchase at HH Gregg, among other items.

(*Id.* at ¶¶ 2, 31-32.)

30. Upon information and belief, "Law Firm B" was the Peirce firm.

31. In settlement of the claims brought by the United States, the Gilkisons entered into a "Stipulation and Order of Settlement and Dismissal" whereby they agreed to "the entry of a judgment . . . against them in favor of the United States, in full compromise and satisfaction of the allegations against them as set forth in the Complaint, for the sum of two hundred thousand dollars ($200,000.00)." (*See* Stip. & Order of Dismissal & Settlement, *U.S. v. Gilkison*, Case No. 1:11-cv-112 at ¶ 2 (S.D. Ohio Feb. 28, 2011) (attached as Exhibit E); Judgment, *U.S. v. Gilkison*, Case No. 1:11-cv-112 (S.D. Ohio Feb. 28, 2011) (attached as Exhibit F).)

**B.      Retention of Clients and Procurement of Medical Diagnoses
         Through Deliberately Unreliable Mass Screenings**

32.    As noted above, the lawyer Defendants routinely utilized mass screenings to
obtain former and current CSXT employees as clients and procure medical diagnoses –
particularly of asbestosis – for them.

33.    The lawyer Defendants actively solicited attendance to their screenings using
interstate mailings and advertisements.  In many instances, the identities of the persons
solicited were obtained from the unlawful practices described in Paragraphs 20 – 31.

34.    Asbestosis, also known as pneumoconiosis, is a chronic inflammatory medical
condition affecting the parenchymal tissue of the lungs caused by long-term, heavy exposure to
asbestos.    The National Institute of Occupational Safety and Health (NIOSH) maintains a
standard protocol for the interpretation of chest x-rays to determine pneumoconiosis caused by
asbestos exposures. NIOSH administers a specialized examination for those who wish to learn
the NIOSH protocol.   Physicians who pass the examination, referred to as B-Readers, visually
analyze opacities and record their findings and interpretations on standard International Labor
Organization, "ILO" forms.  Although asbestosis is a restrictive lung disorder which usually
entails pulmonary function testing, most asbestosis litigation begins with a B-Reader assigning a
"positive" score on an ILO form after reviewing a patient's x-rays and determining the physical
presence of scarring caused by prolonged inhalation of asbestos.

35.    As will be explained below, the lawyer Defendants deliberately orchestrated the
Peirce firm's screenings so as to maximize the likelihood that attendees would receive positive
ILO scores regardless of whether they actually exhibited signs of asbestos-related disease.

36.    Moreover, in the rare instances in which screening attendees did not receive
positive scores, the lawyer Defendants encouraged them to continue attending screenings on a
regular basis.  The lawyer Defendants knew and expected that over time the fraudulent doctors

7

8:16-cv-00368-JMG-FG3   Doc # 1   Filed: 07/28/16   Page 29 of 84 - Page ID # 29
Case 5:05-cv-00202-FPS -JES   Document 841-1   Filed 07/14/11   Page 9 of 41   PageID #:
13353

they utilized would eventually assign positive scores to virtually all screening attendees regardless of whether those individuals actually exhibited signs of asbestos-related disease.

37.     As part of their scheme to manufacture fraudulent claims, the lawyer Defendants purposefully selected and hired black market x-ray technicians such as James Corbitt to conduct their screenings. Corbitt is a convicted felon who habitually disregarded and violated state laws governing the use of x-ray equipment and produced chronically substandard x-rays.

38.     The lawyer Defendants also selected and retained doctors like Defendant Harron to review the x-rays from the screenings and to find signs of asbestos-related diseases regardless of whether the attendees actually exhibited signs of those diseases.

### 1.     James Corbitt

39.     Defendant Peirce first hired James Corbitt and his company, U.S. X-Ray, Inc., to conduct screenings in approximately January 1993. (See, e.g., Quote from Jim Corbitt, U.S. X-Ray, Inc. to Robert Peirce & Associates (Jan. 8, 1993); Letter from James Corbitt to Mr. Robert "Bob" Peirce (Dec. 29, 1997) (collectively attached as Exhibit G).) Although Corbitt initially continued to work for other firms and businesses, by the late 1990s, he worked almost exclusively for the Peirce firm. This trend continued until approximately 2004, when Corbitt ceased participating in Peirce firm screenings. (See James Corbitt Dep. 80:3-81:13, Nov. 17, 2006 (relevant portions attached as Exhibit H).)

40.     Corbitt conducted screenings using a mobile x-ray unit mounted in a GMC straight truck, the back of which he had divided into a waiting room and a second room where the x-rays were actually taken and processed. (See Exhibit H 95:23-96:12.)

41.     In 1972, Corbitt earned a two-year degree as a radiologic technologist from Vanderbilt University's School of Allied Professions in Nashville, Tennessee. Upon graduation he registered with the American Registry of Radiologic Technologists ("AART").

42.     On May 12, 1993 Corbitt pled guilty in the United States District Court for the Northern District of Ohio, Eastern Division to violations of 18 U.S.C. § 641 (Theft of Government

8

8:16-cv-00368-JMG-FG3  Doc # 1  Filed: 07/28/16  Page 30 of 84 - Page ID # 30
Case 5:05-cv-00202-FPS -JES  Document 841-1   Filed 07/14/11  Page 10 of 41  PageID #:
13354

Property) and 26 U.S.C. § 7206(1) (Fraud and False Statements). (See Plea Agreement, United States of America v. James R. Corbitt, and Toni Corbitt, U.S.D.C. Northern District of Ohio, Eastern Division, Case No. 5:93CR133A (attached as Exhibit I).)

43.     On August 12, 1993 the above-named Court sentenced Corbitt to 18 months in prison and three years of supervised release and also ordered him to pay $192,641.29 in restitution to the United States Department of Health and Human Services.  (See Court Order, Aug. 12, 1993 (attached as Exhibit J).)

44.     Thus, for virtually the entire time the lawyer Defendants utilized Corbitt's services, they either knew or recklessly disregarded the fact that he had been convicted of two felonies involving dishonesty and moral turpitude.

45.     Notwithstanding his felonious criminal record, the lawyer Defendants continuously used Corbitt to perform mass x-rays screenings mainly, but not exclusively, across the eastern United States between 1993 and 2004.  Moreover, at most, if not all of the screenings he conducted, Corbitt was completely unsupervised.

46.     Corbitt admits that he did not have any licenses or certifications aside from his AART registration when he began conducting screenings for the lawyer Defendants.  (See Exhibit H 115:11-116:10.)

47.     Thus, Corbitt pervasively violated the laws of virtually every state in which he operated on behalf of the Peirce firm.  These laws generally require radiologic technologists and their equipment to be licensed by the applicable state health board.

48.     For example, in Virginia, where Corbitt admittedly performed screenings on a regular basis, it is "unlawful for a person to practice or hold himself out as practicing as a radiologic technologist or radiologic technologist, limited, unless he holds a license as such issued by the Board [of Health]."  Va. Code Ann. § 54.1-2956.8:1.  Furthermore, "All X-ray machines shall be registered with the Board of Health, and inspected and certified as meeting the standards established pursuant to its regulations. The inspections shall be conducted

9

periodically on a schedule prescribed by the Board." Va. Code Ann. § 32.1-229.1. Finally, pursuant to 18 Va. Admin. Code § 85-101-100(A), "All services rendered by a radiologic technologist shall be performed only upon direction of a licensed doctor of medicine, osteopathy, chiropractic, or podiatry."

49.     Corbitt failed to comply with each of these provisions while conducting screenings on behalf of the Peirce firm in Virginia.

50.     In fact, when deposed about his knowledge of and compliance with the licensing requirements of the states in which he was operating, Corbitt invoked his Fifth Amendment privilege against self-incrimination. (*See* Exhibit H 117:17-119:5.)

51.     Furthermore, at least two states formally disciplined Corbitt for his screening-related conduct during the period in which he regularly worked for the Peirce firm.

52.     On August 21, 2001 the Texas Department of Health issued an Emergency Cease and Desist Order prohibiting Corbitt and U. S. X-Ray from operating x-ray equipment within the state until they obtained a certificate of registration for the equipment. (*See* Order, Aug. 21, 2001 (attached as Exhibit K).)

53.     Not only did the lawyer Defendants continue to use Corbitt and U. S. X-Ray after learning of this Order, Defendant Peirce personally paid half of the $10,000.00 fine that the State of Texas imposed on Corbitt. (*See* Exhibit H 172:9-17; *see also* Robert N. Peirce, Jr. Dep. 147:5-20, May 8, 2007 (relevant portions attached as Exhibit L).)

54.     On January 30, 2002 the Ohio Director of Health formally denied Corbitt's May 29, 1999 and June 30, 2000 applications for a radiologic license in Ohio based on Corbitt's failure to report his felony convictions on his applications and the Board of Health's conclusion that Corbitt did not possess the good moral character necessary to satisfy the requirements of Ohio law. (*See* Order, Jan. 30, 2002 (attached as Exhibit M).)

55.     Corbitt's reckless and unlawful conduct resulted in chronically substandard x-rays that helped further the lawyer Defendants' scheme to defraud CSXT. Specifically, as Corbitt

10

learned in his initial training as a radiologic technologist, underexposed x-rays present a distorted view of lung tissue and enhance the ability of unscrupulous radiologists like Defendant Harron to diagnose asbestos-related diseases where none in fact exist.

56.     By obtaining x-rays through black market technicians like Corbitt, the lawyer Defendants were able to produce, at the lowest possible cost, a steady stream of underexposed films for review by Defendant Harron.

### 2.     Defendant Harron

57.     As previously stated, the lawyer Defendants not only unlawfully hired technicians such as Corbitt to conduct their screenings, they also retained and compensated the doctors who interpreted the resulting x-rays and determined whether they exhibited signs of asbestos-related disease.   The lawyer Defendants filed the claims they manufactured based solely on the findings of these doctors.

58.     The lawyer Defendants most commonly used Defendant Harron to read and interpret the x-rays generated during their screenings.   (See Exhibit L 184:6-17.)   Defendant Peirce has testified that he selected Harron based on his willingness to read an unusually high number of x-rays at a time and his willingness to be paid on a per x-ray, as opposed to hourly, basis.   (Id.; see also id. 196:23-197:21.) This arrangement enhanced Defendant Harron's financial incentive to read as many x-rays as possible without regard to established medical protocols.

59.     Based upon information and belief, however, Defendant Peirce and the other lawyer Defendants utilized Harron not only because of his speed and cost, but also because of his willingness to intentionally misrepresent or recklessly disregard the contents of the x-rays he reviewed and to identify signs of asbestos-related diseases where none in fact existed.

60.     Moreover, Defendant Harron understood that the lawyer Defendants would file lawsuits based solely on his findings.

11

61.     According to the Peirce firm, "since the Peirce Firm began using Dr. Harron to review x-rays until it ceased using him to review x-rays, his rate of positive readings [was] approximately 65%." (*See* Answers of Def. Peirce firm to Pl.'s 1st Reqs. for Admis., No. 19 (attached as Exhibit N).) Regardless of the exact percentage of films Harron read as positive for asbestosis, he generated an artificially high number of cases for the lawyer Defendants and knowingly and willingly ensured that healthy individuals would become asbestosis clients of the Peirce firm.

62.     Defendant Harron's misconduct in occupational illness cases was revealed for the first time by the Honorable Janis G. Jack in the federal multidistrict silica litigation. Specifically, on June 30, 2005 Judge Jack issued a scathing 249 page opinion concluding that it was "clear" that Harron and the other doctors, lawyers, and screening companies involved in the silica litigation "were all willing participants" in a "scheme" to "manufacture [diagnoses] for money." *In re Silica Prods. Litig.*, 398 F. Supp. 2d 563, 635-36 (S.D. Tex. 2005). Moreover, she described the manner in which Harron diagnosed plaintiffs as a "distressing and disgraceful procedure [that] does not remotely resemble reasonable medical practice." *Id.* at 638.

63.     In particular, Judge Jack noted almost 2,000 instances where Harron first found that a plaintiff exhibited signs of asbestosis and then later concluded that the plaintiff exhibited signs of silicosis:

> Finally, the Defendants offered, and Plaintiffs have not disputed, a chart showing all of the Plaintiffs in this MDL who were read by Dr. Harron for silicosis, and who also have an asbestosis claim in the Manville Trust based upon a prior B-read by Dr. Harron. This chart, attached as Exhibit 25, shows that after December 31, 2000 (when N&M changed its focus from asbestos to silica litigation), Dr. Harron found "P", "Q" and "R" opacities (consistent with silicosis) in 99.69% of the 6,350 B-reads he performed for MDL Plaintiffs. But prior to December 31, 2000 (when N&M was focused on asbestos litigation), Dr. Harron performed B-reads on 1,807 of the same MDL Plaintiffs for asbestos litigation, and he found some combination of only "S", "T" and/or "U" opacities (consistent with asbestosis but not silicosis) 99.11% of the time. In short, when Dr. Harron first examined 1,807 Plaintiffs' x-rays for asbestos litigation (virtually all done prior to 2000, when mass silica litigation was just a gleam in a lawyer's eye), he found them all to be consistent only with asbestosis and not with silicosis. But upon re-

12

examining these 1,807 MDL Plaintiffs' x-rays for silica litigation, Dr. Harron found evidence of silicosis in every case.

*Id.* at 607-8. In Judge Jack's words, "a golfer is more likely to hit a hole-in-one than an occupational medicine specialist is to find a single case of both silicosis and asbestosis." *Id.* at 603.

64. Judge Jack further noted that Harron effectively invoked his Fifth Amendment privilege against self-incrimination when confronted by defense counsel regarding his so-called "reversals." *Id.* at 607-8. Harron formalized his invocation of the Fifth Amendment in a brief filed on November 5, 2005.

65. Following Judge Jack's discovery of Harron's rampant misconduct in the silica litigation, the United States Attorney for the Southern District of New York convened a grand jury to investigate possible criminal charges against Harron. The Attorney General of the State of Texas also commenced an investigation into Harron's practices.

66. On September 12, 2005 the claims administrator for the Johns Manville Trust, Claims Resolution Management Corporation ("CRMC"), announced that it would no longer pay claims based on medical reports prepared by Harron and the other doctors involved in the silica litigation:

> The reliability of reports prepared by the[se] doctors and screening facilities . . . has been challenged and is the subject of federal grand jury and congressional investigations into alleged fraud. Based upon evidence presented in the silica Multidistrict Litigation (MDL), the challenge is credible and compels suspension of acceptance of these reports. In the two months since Judge Janis Graham Jack issued her June 30, 2005 Order in the silica MDL, CRMC has received no information or evidence to support continued acceptance of reports prepared by these doctors and facilities. Pending completion of the grand jury and congressional investigations and the litigation in which the reports were ·challenged, CRMC will no longer accept reports prepared by these doctors and facilities.

*(See* CRMC Memo., Sept. 12, 2005 (attached as Exhibit O).)

67. Since the Manville Trust's announcement, the Celotex Trust, the Eagle-Picher Personal Injury Settlement Trust, the United States Gypsum Personal Injury Settlement Trust,

13

8:16-cv-00368-JMG-FG3   Doc # 1   Filed: 07/28/16   Page 35 of 84 - Page ID # 35
Case 5:05-cv-00202-FPS -JES   Document 841-1   Filed 07/14/11   Page 15 of 41   PageID #:
13359

the Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust and the Babcock & Wilcox Asbestos Personal Injury Settlement Trust have all declared that they will no longer pay claims based on medical reports prepared by Harron. (*See* Celotex policy, Oct. 18, 2005 (attached as Exhibit P); Eagle-Picher policy, Oct. 19, 2005 (attached as Exhibit Q); United States Gypsum policy, Feb. 16, 2007 (attached as Exhibit R); Armstrong World Industries, Inc. policy, May 11, 2007 (attached as Exhibit S); and Babcock & Wilcox policy, Aug. 29, 2007 (attached as Exhibit T).)

68.     Moreover, since Judge Jack's opinion, Harron has consistently invoked his Fifth Amendment privilege against self-incrimination when deposed regarding his diagnostic practices in occupational illness cases. For example, when deposed in connection with the W.R. Grace bankruptcy proceedings on December 15, 2005, Harron invoked the privilege 392 times in just 146 pages of testimony. Harron refused to answer questions regarding whether he had a medical degree and in which states he was licensed to practice medicine, as well as whether he was familiar with the American Thoracic Society's guidelines for the diagnosis of nonmalignant disease related to asbestos and whether he followed such guidelines. (*See* Ray Harron Dep., Dec. 15, 2005 (attached as Exhibit U).)

69.     On December 18, 2006, when deposed in connection with asbestos-related litigation pending in Kanawha County, West Virginia, Harron repeatedly invoked his Fifth Amended privilege, including when questioned regarding asbestos-related diagnoses prepared for Defendants Raimond and the Peirce firm. (*See* Ray Harron Dep. 60:7-75:24, Dec. 18, 2006 (relevant portions attached as Exhibit V).)

70.     On March 8, 2006, after being subpoenaed to testify before the Oversight and Investigations Subcommittee of the Energy and Commerce Committee of the United States House of Representatives, Harron informed the Committee chairman that he intended to assert his Fifth Amendment privilege in response to all questions that might be asked. (*See* Ray Harron Test., March 8, 2006 (attached as Exhibit W).)

14

8:16-cv-00368-JMG-FG3   Doc # 1   Filed: 07/28/16   Page 36 of 84 - Page ID # 36
Case 5:05-cv-00202-FPS -JES   Document 841-1   Filed 07/14/11   Page 16 of 41 PageID #:
13360

71.     More recently, Harron invoked his Fifth Amendment privilege and refused to

answer questions regarding his diagnostic practices when deposed in connection with an

asbestos-related case previously pending in this Court.   *See Ayers v. Cont'l Cas. Co*, 2007

U.S. Dist. LEXIS 47963, *4 (N.D. W. Va. 2007) ("Defendant took the deposition of Dr. Harron.

However, Dr. Harron refused to answer questions about his interpretations of x-rays, instead

pleading his Fifth Amendment right against self-incrimination.").

72.     As a result of Harron's medical misconduct in the silica litigation, at least seven

state medical licensing agencies have instituted disciplinary proceedings against him.   In

California and Florida, Harron agreed to voluntarily surrender his medical license.   In

Mississippi, New Mexico and Texas, Harron entered into agreed orders not to practice medicine

until his license expired and not to renew it thereafter.   Finally, North Carolina and New York

permanently revoked Harron's medical license.   (*See* Orders from State Med. Licensing

Agencies: Med. Bd. of Cal. (June 11, 2008); Fla. Bd. of Med. (June 19, 2008); Miss. State Bd. of

Med. Licensure (Nov. 8, 2007); N.M. Med. Bd. (June 20, 2008); N.C. Med. Bd. (Dec. 14, 2007);

Tex. Med. Bd. (April 13, 2007); and N.Y. State Bd. for Prof'l Med. Conduct (Dec. 30, 2008)

(collectively Exhibit X).)

73.     In affirming the findings of the New York State Board of Professional Medical

Conduct, the New York Administrative Review Board stated:

"[T]he Respondent had inadequate information about the reliability of exposure
histories and . . . made inadequate efforts to rule out causes other than silicosis
for what x-rays showed.   *This conduct constituted [a] repeated failure to
follow accepted medical practice or negligence on more than one occasion.*
After a time, the Respondent did not review or edit reports that went out under
his name and the reports indicated that the Respondent relied on physical
examinations in making a diagnosis, even if the physical examinations added
nothing to a diagnosis.   *This conduct amounted to intentional
misrepresentation and leads to the inference that the Respondent intended
to deceive.   This constitutes fraud in the practice of medicine. . . . The
record demonstrates that the Respondent used his medical license to
engage in ongoing fraud on the courts.*

15

(See Determination & Order No. 09-02, N.Y. Dept. of Health, Admin. Rev. Bd. for Prof. Med.

Cond. (July 10, 2009) (emphasis added) (attached as Exhibit Y).)

### C. Prosecution of Claims Using Dishonest, Fraudulent and Deceptive Practices

74. The impropriety of the lawyer Defendants' misconduct, however, was not limited

to the screening process.

75. Once the lawyer Defendants received a positive diagnosis from Defendant

Harron or their other doctors, they continued upon a course of intentionally fraudulent and

unlawful conduct to ensure that all claims, regardless of their objective merit and validity, were

filed and settled.

76. Specifically, the lawyer Defendants sent or caused to be sent letters to their

clients stating:

> It is also important to remember that you never suspected you had asbestosis
> and/or silicosis until you got the results back from the recent screenings. This is
> important because if you tell a doctor, or someone else, that you have thought
> that you may have had some pulmonary disease for over three years, then the
> statute of limitations will preclude you bringing a lawsuit and being compensated
> for your on-the-job exposure at the railroad.

(See, e.g., Letter from Robert Peirce, Jr. to James F. Blocker (July 15, 1999) (attached as

Exhibit Z).)

77. Furthermore, the lawyer Defendants "coached" their clients regarding the

sources of their alleged asbestos exposure. For example, on October 25, 2001, the lawyer

Defendants, by and through Danielle Daley, the Peirce firm's "Railroad Project Manager,"

caused a letter to be mailed to Gene R. Sanders stating, in part, as follows: "I am enclosing a

'Sample Questionnaire,' that I filled out, so that you would be able to see examples of how the

questions [regarding sources of asbestos exposure] should be answered." (See Letter from

Danielle Daley to Gene R. Sanders (Oct. 25, 2001) (attached as Exhibit AA).)

78. The lawyer Defendants also furnished their clients with pre-printed, boilerplate

asbestosis diagnosis forms, which they encouraged their clients to have endorsed by a

16

cooperating physician. (See, e.g., Exemplar Form (attached as Exhibit BB).) The lawyer Defendants then submitted these diagnoses to the various asbestos bankruptcy settlement trusts (and in some cases, to CSXT as well) on behalf of their clients, and used the fees from these claims in part to fund their mass asbestos scheme against CSXT.

79.    The Honorable Arthur M. Recht of the Circuit Court of Ohio County, West Virginia, who has presided over the lawyer Defendants' asbestos cases against CSXT in West Virginia since 2002, has concluded in a formal written order that Defendant Peirce's communications with his asbestos clients were "misleading and inaccurate." (See Dismissal Order, Chambers v. CSX Transp., Inc., Civil Action No. 02-C-9500 (Kanawha Cir Ct., Nov. 19, 2009) at 5, ¶ 2 (attached as Exhibit CC).)

80.    Throughout the foregoing process, the lawyer Defendants acted with virtually no guidance from or communication with their clients.

## II.    WEST VIRGINIA'S ASBESTOS CRISIS AND THE MASS LITIGATION PANEL

81.    "Asbestos cases such as those we are now considering present a complex pattern of legal, social, and political issues that threaten to cripple the common law system of adjudication, if for no other reason by the sheer volume of cases." State ex rel. Appalachian Power Co. v. MacQueen, 198 W. Va. 1, 4 (1996).

82.    In response to the crisis it confronted in MacQueen, the West Virginia Supreme Court of Appeals implemented Trial Court Rule 26.01 on July 1, 1999. Rule 26.01 established a six member Mass Litigation Panel responsible for developing and implementing case management and trial methodologies for mass litigation and fairly and expeditiously disposing of civil litigation which may be referred to it by the Chief Justice.

83.    Rule 26.01 provides that any party, judge, or the Administrative Director of the Courts may seek a referral to the Panel for transfer of actions by filing a Motion to Refer to Mass Litigation Panel in any circuit court in which a qualified case is pending.

17

8:16-cv-00368-JMG-FG3  Doc # 1  Filed: 07/28/16  Page 39 of 84 - Page ID # 39
Case 5:05-cv-00202-FPS -JES  Document 841-1  Filed 07/14/11  Page 19 of 41  PageID #:
13363

84.     On June 27, 2000, pursuant to Rule 26.01, the Honorable A. Andrew MacQueen
and the Honorable Arthur M. Recht of the Mass Litigation Panel filed a motion with the Chief
Justice of the Supreme Court of Appeals requesting the referral of all asbestos-based personal
injury cases pending in West Virginia state courts to the Mass Litigation Panel.

85.     CSXT filed an opposition to the referral contending that the cases against it did
not meet the requirements of Rule 26.01. This opposition was argued before the Mass
Litigation Panel on November 8, 2000.

86.     On November 17, 2000 the Supreme Court entered an Order granting Judges
MacQueen's and Recht's June 27, 2000 Motion to Refer. (See Order, Nov. 17, 2000 (attached
as Exhibit DD).) On December 20, 2000 the Supreme Court transferred all asbestos cases
referred to the Mass Litigation Panel to the Circuit Court of Kanawha County and designated
Judge MacQueen to preside over them.

87.     On July 9, 2001 the Supreme Court entered an Order appointing the Honorable
Martin J. Gaughan to preside over the asbestos cases referred to the Mass Litigation Panel.
(See Order, July 9, 2001 (attached as Exhibit EE).) The Order also referred "all asbestos
personal injury cases filed subsequent to the Motion to Refer on June 27, 2000" to the Mass
Litigation Panel, and stated that "any asbestos personal injury litigation filed subsequent to the
entry of this order, may, upon appropriate order, be transferred to the Mass Litigation Panel for
consideration of assignment to the appropriate trial group upon a motion of a party, or upon a
motion of a member of the Mass Litigation Panel, or upon a motion of the Honorable Martin J.
Gaughan, or the judge subsequently assigned by the Chief Justice of the Supreme Court of
Appeals of West Virginia to hear any case or trial group." (Id.)

88.     On July 9, 2002 the Supreme Court entered an Order assigning Judge Recht "to
replace the Honorable Martin J. Gaughan as the Supervising Judge to preside in Asbestos
cases referred to the Mass Litigation Panel." (See Order, July 9, 2002 (attached as Exhibit
FF).)

18

## III.  THE LAWYER DEFENDANTS OVERWHELM CSXT WITH MASS ASBESTOS LAWSUITS IN WEST VIRGINIA

89.    As described herein, beginning in 2000 the lawyer Defendants embarked upon a concerted campaign to overwhelm CSXT with thousands of asbestos-related occupational illness claims in courts across West Virginia.  Specifically, the lawyer Defendants caused to be filed no less than six mass lawsuits asserting claims on behalf of more than 5,300 plaintiffs, the vast majority of whom were not West Virginia residents, nor did their claims have any nexus to the State.  The lawyer Defendants deliberately filed these claims in mass lawsuits in an overburdened court system in an effort to conceal fraudulent claims and to leverage higher settlements based on the threat of mass trials.

90.    On March 20, 2000 the lawyer Defendants, by and through Defendant Coulter, caused to be filed *Ronald Abbott, et al. v. CSX Transp., Inc.*, Civil Action No. 00-C-64 ("*Ronald Abbott*"), in the Circuit Court of Marshall County, West Virginia.  (*See* Compl. (relevant portions attached as Exhibit GG).)  The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved the use of the mails and/or wires of the United States.  Specifically, the lawyer Defendants, by and through the Secretary of State of West Virginia, caused the Complaint and Summons to be served upon CSXT on March 22, 2000 via certified United States mail.  (*See* Notice of Service (attached as Exhibit HH).)

91.    *Ronald Abbott* asserted claims for occupational illness on behalf of approximately 2,012 plaintiffs, 1,822 of whom were not West Virginia residents.  The out-of-state plaintiffs resided in virtually every state in which CSXT operates, including Alabama, Arkansas, Delaware, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, North Carolina, New York, Ohio, Pennsylvania, South Carolina, Tennessee and Virginia.

92.    The *Ronald Abbott* Complaint contained no individualized allegations and instead generally averred, in pertinent part:

19

> While working for the defendant, the plaintiffs were exposed to and caused to inhale asbestos fibers, free silica, diesel fumes, solvent fumes, gasoline fumes, fibrogenic materials, carcinogenic materials and/or other substances deleterious to the respiratory system.
>
> As a proximate result direct and proximate result of the defendant's negligence, the plaintiffs have developed asbestosis, asbestos related pleural disease, silicosis, mixed dust pneumoconiosis, chronic obstructive pulmonary disease, occupational asthma, occupational bronchitis, cancer, and increased risk of cancer and/or other serious and severe respiratory diseases, and have suffered other bodily injuries, including a greatly increased risked of developing mesothelioma, bronchogenic carcinoma, or other cancerous conditions, and suffer difficulty breathing, as well as other serious and severe injuries which may be permanent.

(See Exhibit GG at ¶¶ 2025, 2029.)  Thus, the Complaint failed to inform CSXT of even the

most basic facts on which each plaintiff's claim was based, including the substance or

substances to which they claimed exposure and the disease or diseases they claimed to have

developed as a result of their exposure.  Moreover, the Complaint contained no allegations

regarding the manner in which the plaintiffs were diagnosed with their alleged diseases, or by

whom those diagnoses were made.

93.     *Ronald Abbott* was transferred to the Mass Litigation Panel by operation of the

Supreme Court's November 17, 2000 Order described in Paragraph 86.

94.     On August 1, 2001 the lawyer Defendants, by and through Defendant Coulter,

caused to be filed *Charles Abbott, et al. v. CSX Transp., Inc.*, Civil Action No. 01-C-162

("*Charles Abbott*"), in the Circuit Court of Marshall County, West Virginia.  (See Compl.

(relevant portions attached as Exhibit II).)  The filing of this lawsuit and service of the Summons

and Complaint upon CSXT involved the use of the mails and/or wires of the United States.

Specifically, the lawyer Defendants, by and through the Secretary of State of West Virginia,

caused the Complaint and Summons to be served upon CSXT on August 6, 2001 via certified

United States mail.  (See Notice of Service (attached as Exhibit JJ).)

95.     *Charles Abbott* asserted claims for occupational illness on behalf of

approximately 917 plaintiffs, 736 of whom were not West Virginia residents.  The out-of-state

20

plaintiffs resided in Florida, Illinois, Indiana, Kentucky, Maryland, Michigan, Missouri, Ohio, Pennsylvania, Tennessee and Virginia.

96.    Aside from the plaintiffs, the *Charles Abbott* Complaint was substantially the same as the *Ronald Abbott* Complaint described in Paragraph 90 and therefore failed to inform CSXT of even the most basic facts on which each plaintiff's claim was based. (*See* Exhibit II at ¶¶ 924, 928.)

97.    Although the lawyer Defendants never formally moved to refer *Charles Abbott* to the Mass Litigation Panel, as was their unilateral right under Trial Court Rule 26.01, at all relevant times it has been treated by the lawyer Defendants and the Mass Litigation Panel as if it had been.

98.    On September 6, 2001, in response to the "overcrowding of the circuit courts' dockets in this State caused by the overwhelming number of asbestos cases now in litigation," Judge Gaughan entered a "Mediation Order Governing Railroad Cases" (the "Mediation Order"). (*See* Report, Sept. 6, 2001 at 1, 4 (attached as Exhibit KK).)   This Order applied to all asbestos cases referred to the Mass Litigation Panel pending between CSXT and plaintiffs represented by the Peirce firm as of September 6, 2001.   (*See* Mediation Order at ¶ 2 (attached as Exhibit LL).)   By its terms, the Mediation Order did not apply to lawsuits filed after September 6, 2001.

99.    The Mediation Order established a mandatory three-step process: 1) initial settlement negotiations between the parties, 2) monthly settlement conferences, and 3) monthly mediation sessions for claims not settled at the conferences.   (*See* Exhibit LL at ¶¶ 6-11.)   In place of the discovery normally permitted under West Virginia law, the Order required each plaintiff to produce an x-ray in support of their claim, an authorization to obtain medical records, an authorization to obtain records maintained by the Railroad Retirement Board, and a written questionnaire describing their work and medical histories.   (*Id.* at ¶¶ 13-14.)   It also permitted the railroads "to conduct one hour depositions on an as needed basis."   (*Id.* at ¶ 15.)   Finally, the Order provided, "Any cases which cannot be resolved through the three stages of the

21

settlement/mediation program . . . will be transferred to a trial docket, to be resolved at a later date. When cases are transferred to the trial docket and upon permission of the court, full discovery of the case can begin." (*Id.* at ¶ 11.)

100.    In a report issued in conjunction with the Mediation Order, Judge Gaughan indicated that any claims not resolved through the mediation process were to be tried in a single mass trial scheduled for October 29, 2002. (*See* Exhibit KK at 5.) Thus, in the event CSXT did not settle the claims brought by the lawyer Defendants, it faced expedited mass discovery followed by a mass trial of approximately 3,000 individual plaintiffs, each with different work and medical histories, alleged injuries and alleged damages.

101.    The first court mandated settlement conference between CSXT and plaintiffs represented by the Peirce firm occurred in October 2001.

102.    Due to the massive number of plaintiffs involved, the conferences continued on a monthly or bi-monthly basis until approximately May 2004. Defendant(s) Peirce and/or Raimond attended the conferences on behalf of the plaintiffs and conducted negotiations with CSXT.

103.    Prior to each settlement conference, CSXT was forced to evaluate the claims of as many as 150 plaintiffs, which imposed an overwhelming burden on CSXT and its attorneys.

104.    Seizing upon the overburdened state of the West Virginia court system and the ongoing mediation process with respect to the approximately 3,000 *Ronald Abbott* and *Charles Abbott* plaintiffs, the lawyer Defendants continued to file new mass asbestos lawsuits against CSXT in West Virginia. As with *Ronald Abbott* and *Charles Abbott*, the overwhelming majority of the plaintiffs in the new lawsuits were not residents of West Virginia, nor did their claims have any nexus to the State.

105.    On April 9, 2002 the lawyer Defendants, by and through Defendant Coulter, caused to be filed *William T. Amos, et al. v. CSX Transp., Inc.*, Civil Action No. 02-C-93 ("*Amos*"), in the Circuit Court of Marshall County, West Virginia. (*See* Compl. (relevant portions

22

attached as Exhibit MM).) The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved the use of the mails and/or wires of the United States. Specifically, the lawyer Defendants, by and through the Secretary of State of West Virginia, caused the Complaint and Summons to be served upon CSXT on April 11, 2002 via certified United States mail. (See Notice of Service (attached as Exhibit NN).)

106. Amos asserted claims for occupational illness on behalf of approximately 100 plaintiffs, 77 of whom were not West Virginia residents. The out-of-state plaintiffs resided in Kentucky and Ohio.

107. Aside from the plaintiffs, the Amos Complaint was substantially the same as the Ronald Abbott Complaint described in Paragraph 90 and therefore failed to inform CSXT of even the most basic facts on which each plaintiff's claim was based. (See Exhibit MM at ¶¶ 107, 111.)

108. Although the lawyer Defendants never formally moved to refer Amos to the Mass Litigation Panel, as was their unilateral right under Trial Court Rule 26.01, at all relevant times it has been treated by the lawyer Defendants and the Mass Litigation Panel as if it had been.

109. As a result of the overwhelming burdens imposed by the ongoing mediation process with respect to the approximately 3,000 Ronald Abbott and Charles Abbott plaintiffs, CSXT was unable to commence discovery in Amos until no earlier than the conclusion of the settlement conferences on or about May 2004. In this respect, the lawyer Defendants succeeded in their scheme to deprive CSXT of access to discovery by repeatedly filing mass lawsuits in an overburdened court system.

110. Moreover, prior to commencing discovery and consistent with reasonable litigation practice, CSXT intended to – and did in fact – move to dismiss Amos based on the doctrine of forum non conveniens. Pursuant to applicable law at the time, this motion required CSXT to conduct:

23

a. A review and analysis of internal medical and personnel records for each of the 100 plaintiffs to determine whether their claims had any nexus to the State of West Virginia.

b. An analysis of the Marshall County Circuit Court's docket, which was hampered by the fact that, at the time, the Marshall County Circuit Court only reported the number of complaints filed and not the number of plaintiffs included in those complaints. As a result, CSXT was forced to manually calculate the number of plaintiffs with cases pending in Marshall County.

c. An analysis of the dockets in the localities in Kentucky and Ohio where the plaintiffs resided to determine whether their claims could be tried substantially more inexpensively and expeditiously in those forums than in Marshall County.

111.    CSXT filed its motion to dismiss based on forum non conveniens in *Amos* on October 7, 2004. The motion was argued before Judge Recht on February 10, 2005 and denied by order dated May 24, 2005.

112.    On May 19, 2003 the lawyer Defendants, by and through Defendant Coulter, caused to be filed *George E. Abel, et al. v. CSX Transp., Inc.*, Civil Action No. 03-C-208 ("*Abel*"), in the Circuit Court of Harrison County, West Virginia. (*See* Compl. (relevant portions attached as Exhibit OO).) The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved the use of the mails and/or wires of the United States. Specifically, the lawyer Defendants, by and through the Secretary of State of West Virginia, caused the Complaint and Summons to be served upon CSXT on May 22, 2003 via certified United States mail. (*See* Notice of Service (attached as Exhibit PP).)

113.    *Abel* asserted claims for occupational illness on behalf of approximately 1,438 plaintiffs, 1,326 of whom were not West Virginia residents. The out-of-state plaintiffs resided in virtually every state in which CSXT operates and several in which it does not, including Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland,

24

Michigan, Missouri, Mississippi, North Carolina, New York, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Texas and Virginia.

114.  Aside from the plaintiffs, the *Abel* Complaint was substantially the same as the *Ronald Abbot* Complaint described in Paragraph 90 and therefore failed to inform CSXT of even the most basic facts on which each plaintiff's claim was based. (*See* Exhibit OO at ¶¶ 1374, 1378.)

115.  *Abel* was referred to the Mass Litigation Panel by Order of the Supreme Court dated July 25, 2003. (*See* Order, July 25, 2003 (attached as Exhibit QQ).)

116.  As a result of the overwhelming burdens imposed by the ongoing mediation process with respect to the approximately 3,000 *Ronald Abbott* and *Charles Abbott* plaintiffs, CSXT was unable to commence discovery in *Abel* until no earlier than the conclusion of the settlement conferences on or about May 2004.  In this respect, the lawyer Defendants succeeded in their scheme to deprive CSXT of access to discovery by repeatedly filing mass lawsuits in an overburdened court system.

117.  Moreover, prior to commencing discovery and consistent with reasonable litigation practice, CSXT intended to – and did in fact – move to dismiss *Abel* based on the doctrine of forum non conveniens.  Pursuant to applicable law at the time, this motion required CSXT to conduct:

> a.  A review and analysis of internal medical and personnel records for each of the 1,438 plaintiffs to determine whether their claims had any nexus to the State of West Virginia.
>
> b.  An analysis of the Harrison County Circuit Court's docket.
>
> c.  An analysis of the dockets in the localities in the approximately 22 different states where the plaintiffs resided to determine whether their claims could be tried substantially more inexpensively and expeditiously in those forums than in Harrison County.

25

118. CSXT filed its motion to dismiss based on forum non conveniens in *Abel* on October 7, 2004. The motion was argued before Judge Recht on February 10, 2005 and denied by Order dated May 24, 2005.

119. On June 23, 2005 the lawyer Defendants caused to be filed a Motion to Refer Cases to Mediation in *Amos, Abel* and several other lawsuits. (*See* Mot. to Refer Cases to Med. (attached as Exhibit RR).) This motion represented a continuation of the lawyer Defendants' strategy to deprive CSXT of access to full discovery in individual cases in order to conceal fraudulent claims and to leverage higher settlements.

120. Between July and December 2005, CSXT filed multiple briefs in opposition to the lawyer Defendants' motion for mediation.

121. Additionally, following Judge Jack's exposure of Defendant Harron's misconduct in the silica litigation as described in Paragraphs 62 - 65, CSXT attempted to depose Harron regarding his involvement with the claims filed by the lawyer Defendants, but the lawyer Defendants refused to make Harron available.

122. Thereafter, CSXT moved to dismiss *Amos, Abel* and several other lawsuits on the basis that the claims asserted therein were filed without admissible evidentiary support and therefore violated Rule 11 of the West Virginia Rules of Civil Procedure.

123. On February 3, 2006 Judge Recht entered an order denying the lawyer Defendants' motion for mediation and CSXT's motion to dismiss. (*See* Order, Feb. 3, 2006 (attached as Exhibit SS).) Additionally, the order scheduled three groups of 50 plaintiffs each for trial on July 10, 2006, October 10, 2006 and January 8, 2007. (*See id.*) With respect to these plaintiffs, the order permitted written discovery and examinations under Rule 35 of the West Virginia Rules of Civil Procedure. However, it did not authorize depositions absent the mutual agreement of the parties, which provided the lawyer Defendants with the unilateral ability to continue hiding the true nature of the fraudulent claims they filed. (*See id.*) Moreover, the Order did not authorize any form of discovery with respect to non-trial group plaintiffs.

26

124.    Even after the publication of Judge Jack's opinion discussing Defendant Harron's misconduct in the silica litigation, the commencement of criminal and congressional investigations into his practices, and the rejection of his diagnoses by most major asbestos settlement trusts, the lawyer Defendants continued to file mass asbestos lawsuits against CSXT in West Virginia based in whole or in part on Harron B-reads. However, at the time these suits were filed, CSXT did not know and could not reasonably have known that some or all of the claims were based in whole or in part on Harron reads.

125.    On February 21, 2006 the lawyer Defendants, by and through Robert F. Daley, caused to be filed *Charles Adams, et al. v. CSX Transp., Inc.* ("*Charles Adams*"), Civil Action No. 06-C-72, in the Circuit Court of Harrison County, West Virginia. (*See* Compl. (relevant portions attached as Exhibit TT).)  The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved the use of the mails and/or wires of the United States. Specifically, the lawyer Defendants, by and through the Secretary of State of West Virginia, caused the Complaint and Summons to be served upon CSXT on May 15, 2006 via certified United States mail. (*See* Notice of Service (attached as Exhibit UU).)

126.    *Charles Adams* asserted claims for occupational illness on behalf of approximately 253 plaintiffs, all but two of whom were not West Virginia residents.  The out-of-state plaintiffs resided in Alabama, Florida, Georgia, Illinois, Indiana, Kentucky, North Carolina, Ohio, South Carolina, Tennessee, Texas and Virginia.

127.    Aside from the plaintiffs, the *Charles Adams* Complaint was substantially the same as the *Ronald Abbott* Complaint described in Paragraph 90 and therefore failed to inform CSXT of even the most basic facts on which each plaintiff's claim was based. (*See* Exhibit TT at ¶¶ 260, 264.)

128.    On June 13, 2006 CSXT filed a motion to dismiss *Charles Adams* on the basis that it violated West Virginia Code § 56-1-1. On September 11, 2006 Judge Recht entered an order granting CSXT's motion and dismissing *Charles Adams*, which was later affirmed by the

27

West Virginia Supreme Court of Appeals. *See In re FELA Asbestos Cases*, 222 W. Va. 512 (2008). Although the lawyer Defendants attempted to file a petition for a writ of certiorari with the United States Supreme Court, it was rejected as untimely.

129.   On July 27, 2006 the lawyer Defendants, by and through Robert F. Daley, caused to be filed *Herbert Adams, et al. v. CSX Transp., Inc.* ("*Herbert Adams*"), Civil Action No. 06-C-182, in the Circuit Court of Harrison County, West Virginia. (*See* Compl. (relevant portions attached as Exhibit VV).)   The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved the use of the mails and/or wires of the United States. Specifically, the lawyer Defendants, by and through the Secretary of State of West Virginia, caused the Complaint and Summons to be served upon CSXT on August 11, 2006 via certified United States mail. (*See* Notice of Service (attached as Exhibit WW).)

130.   *Herbert Adams* asserted claims for occupational illness on behalf of approximately 605 plaintiffs, only 70 of whom lived or worked in West Virginia.

131.   Aside from the plaintiffs, the *Herbert Adams* Complaint was substantially the same as the *Ronald Abbott* Complaint described in Paragraph 90 and therefore failed to inform CSXT of even the most basic facts on which each plaintiff's claim was based. (*See* Exhibit VV at ¶¶ 612, 616.)

132.   On October 19, 2006 CSXT filed a motion to dismiss *Herbert Adams* on the basis that it violated West Virginia Code § 56-1-1. On December 14, 2006 Judge Recht entered an order granting CSXT's motion and dismissing *Herbert Adams*, which was later affirmed by the West Virginia Supreme Court of Appeals. *See In re FELA Asbestos Cases*, 222 W. Va. 512 (2008). Although the lawyer Defendants attempted to file a petition for a writ of certiorari with the United States Supreme Court, it was rejected as untimely.

133.   On November 30, 2007 the lawyer Defendants caused to be filed yet another motion to refer cases to mediation, thereby further evidencing their deliberate strategy to deprive CSXT of access to discovery in individual cases in order to conceal fraudulent claims

28

and leverage higher settlements. (*See* Pls.' Renew. Mot. to Refer Cases to Med., *In re FELA Asbestos Cases*, Civil Action No. 02-C-9500 (Kanawha Cir Ct.) (attached as Exhibit XX).) Among others, this motion covered the *Amos* and *Abel* cases pending since 2002 and 2003, respectively. CSXT opposed the motion, which was denied by Judge Recht.

134. On October 28, 2008 the lawyer Defendants, by and through Robert F. Daley, caused to be filed *Jerry Abbott, et al. v. CSX Transp., Inc.* ("*Jerry Abbott*"), Civil Action No. 08-C-2120 *et seq.*, in the Circuit Court of Kanawha County, West Virginia. (*See* Compl. (relevant portions attached as Exhibit YY).) The filing of this lawsuit and service of the Summons and Complaint upon CSXT involved the use of the mails and/or wires of the United States. Specifically, the lawyer Defendants, by and through the Secretary of State of West Virginia, caused the Complaint and Summons to be served upon CSXT on February 4, 2009 via United States mail. (*See* Notice of Service (attached as Exhibit ZZ).)

135. *Jerry Abbott* re-asserted the claims of most, if not all, of the former *Charles Adams* and *Herbert Adams* plaintiffs. (*See* Mem. of Op. & Order, *Jerry Abbott, et al. v. CSX Transp., Inc.*, Civil Action No. 08-C-2120 *et seq.* at 2 (Kanawha Cir Ct., July 11, 2009) (attached as Exhibit AAA).) Subsequent to its filing, *Jerry Abbott* was transferred to the Mass Litigation Panel. (*See id.*)

136. On March 19, 2009 CSXT moved Judge Recht for the entry of a case management order applicable to all remaining Peirce firm non-malignant asbestos cases against CSXT in West Virginia. At that time, virtually all of the *Amos*, *Abel* and *Jerry Abbott* claims, as well as various other cases, were still pending. CSXT argued there was substantial evidence showing:

> the Peirce firm systematically employed unreliable methods of determining the health status of its clients, leading on numerous occasions to lawsuits against CSXT brought on behalf of plaintiffs who either do not suffer from the conditions alleged, have not been formally diagnosed with the conditions alleged, or do not themselves believe they suffer from the conditions alleged.

29

(CSXT's Mot. for Entry of Case Mgmt. Order, *In Re FELA Asbestos Cases*, Civil Action No. 02-C-9500 (Kanawha Cir. Ct.) at ¶ 3 (attached as Exhibit BBB).) Accordingly, CSXT requested "that the Court take steps to ensure the legitimacy of all pending and future claims brought by the Peirce firm." (*Id.* at 4.)

137.   On July 11, 2009 Judge Recht dismissed *Jerry Abbott* on preclusion grounds. (*See* Exhibit CCC.) Only 36 plaintiffs appealed this decision and their petition was unanimously denied by the Supreme Court of Appeals. (*See* denial (attached as Exhibit DDD).)

138.   On September 17, 2009 Judge Recht entered a slightly modified version of the case management order ("CMO") CSXT proposed in connection with its March 19, 2009 motion referenced in Paragraph 136. (*See* Rev. Case Mgmt. Order, *In re FELA Asbestos Cases*, Civil Action No. 02-C-9500 (Kanawha Cir Ct., Sept. 9, 2009) (attached as Exhibit EEE).) The first phase of the CMO required each claimant to, among other things, certify in writing to the court and CSXT that he or she "is aware of his or her lawsuit" and "believes that his or her claims and the assertions contained within the complaint are well-founded in fact." (*Id.* at 1, Sec. III.) In other words, the CMO required each claimant to verify that their claim meets the requirement of Rule 11 of the West Virginia Rules of Civil Procedure.

139.   Rather than attempt to comply with this basic procedural requirement, the lawyer Defendants caused to be filed a motion to vacate the CMO and a motion to voluntarily dismiss, without prejudice, all but two of the approximately 1,400 claims they identified as being subject to the CMO. (*See* Peirce Firm Pls.' Mot. to Vac. CMO, *In Re FELA Asbestos Cases*, Civil Action No. 02-C-9500 (Kanawha Cir. Ct.) (attached as Exhibit FFF); Peirce Firm Pls.' Mot. to Dismiss, *In Re FELA Asbestos Cases*, Civil Action No. 02-C-9500 (Kanawha Cir. Ct.) (attached as Exhibit GGG).) Among others, the motion to dismiss covered nearly 1,200 of the *Abel* claims pending since 2003, including the claims of Miledge Hill, James Peterson, A. Lewis Schabow, Aubrey Shelton and Donald Wiley discussed in Paragraph 147(b) below.

30

140.     The lawyer Defendants' motions to vacate and to dismiss, which sought to avoid
even the most basic certification and disclosure requirements of the CMO, further prove the
claims at issue were baseless.

141.     CSXT opposed the lawyer Defendants' motions to vacate and to dismiss and
moved for the dismissal, with prejudice, of all claims subject to the CMO.

142.     On June 14, 2010, Judge Recht entered an order dismissing, with prejudice, all
but two of the over 1,400 claims subject to the CMO. (See Order of Dismissal with Prejudice, In
Re FELA Asbestos Cases, Civil Action No. 02-C-9500 (Kanawha Cir. Ct., June 14, 2010)
(attached as Exhibit HHH).)   The remaining two cases were later dismissed with prejudice as
well.

## IV.   HARRON AND THE LAWYER DEFENDANTS FABRICATE AND PROSECUTE OBJECTIVELY UNREASONABLE ASBESTOS CLAIMS WITH NO BASIS IN FACT

143.     As previously discussed, the lawyer Defendants deliberately filed mass lawsuits
in an overburdened court system in an effort to deny CSXT access to meaningful discovery and
thereby conceal fraudulent claims.

144.     Based on materials obtained through discovery in this case, CSXT has identified
numerous instances in which Harron first determined that a Peirce firm screening attendee did
not exhibit signs of asbestosis, but then later, based on a second x-ray, determined that the
individual exhibited signs of asbestosis despite the objectively unchanged condition of the
individual's lungs.

145.     Eleven specific examples of this conduct, including the names of the individuals,
the dates and locations of the relevant x-rays – all taken by Corbitt – and the dates of Harron's
reads, are listed in Exhibit III.   Harron's ILO forms are attached as Exhibit JJJ.

146.     In each of the eleven examples listed in Exhibit III, Harron's determination that
the individual exhibited signs of asbestosis was medically unreasonable and not the product of
inter-reader or intra-reader variability, or random mistake.   Instead, Defendant Harron either

31

deliberately misrepresented or recklessly disregarded the content of the subject individuals' x-rays in furtherance of his and the lawyer Defendants' scheme to fabricate meritless asbestos claims against CSXT.

147.   Furthermore, in each instance, the lawyer Defendants knew or should have known that Harron's determinations were medically unreasonable.   Nevertheless, the lawyer Defendants filed or caused to be filed personal injury claims on behalf of each of the eleven individuals, the circumstances of which are as follows:

- a. Morris Collier was a plaintiff in *Amos*.   (*See* Exhibit MM at ¶ 19.)   On September 18, 2003, by and through an email from Danielle Daley to Bo Bobersky the lawyer Defendants caused Collier's claim to be settled for $25,000.00.   (*See* Email from Danielle Daley to Bo Bobersky (Sept. 18, 2003) (attached as Exhibit KKK).)

- b. Miledge Hill, James Petersen, A. Lewis Schabow, Aubrey Shelton and Donald Wiley were plaintiffs in *Abel*.   (*See* Exhibit OO at ¶¶ 499, 860, 974, 992, 1215.) Each of these individuals' claims remained pending until June 14, 2010, when they were dismissed with prejudice pursuant to Judge Recht's mass dismissal order.

- c. Earl Baylor and Archie Wilkins were plaintiffs in *Charles Adams* and, subsequently, *Jerry Abbott*.   (*See* Exhibit TT at ¶¶ 13, 241; Exhibit YY.)   As noted above, *Charles Adams* was dismissed on September 11, 2006, with said dismissal being affirmed by the Supreme Court of Appeals on July 2, 2008.   Earl Baylor's subsequent *Jerry Abbott* claim was voluntarily dismissed, without prejudice, on December 26, 2008.   (*See* Notice of Voluntary Dismissal, *Earl Baylor v. CSX, Transp., Inc.*, Case No. 08-C-2155 (Kanawha Cir. Ct.) (attached as Exhibit LLL).)   Archie Wilkins' subsequent *Jerry Abbott* claim was dismissed pursuant to Judge Recht's July 11, 2009 order.

32

8:16-cv-00368-JMG-FG3  Doc # 1  Filed: 07/28/16  Page 54 of 84 - Page ID # 54
Case 5:05-cv-00202-FPS -JES  Document 841-1    Filed 07/14/11  Page 34 of 41  PageID #:
13378

d. Nelson Andrews, Hubert Harrison and Herman Lincoln were plaintiffs in *Herbert
Adams* and, subsequently, *Jerry Abbott*. (*See* Exhibit VV at ¶¶ 8, 212, 318;
Exhibit YY at .) As noted above, *Herbert Adams* was dismissed on December
14, 2006, with said dismissal being affirmed by the Supreme Court of Appeals on
July 2, 2008. Each individual's subsequent *Jerry Abbott* claim was dismissed
pursuant to Judge Recht's July 11, 2009 order.

148. At the time the lawyer Defendants filed or caused to be filed the claims on behalf
of these eleven individuals, the lawyer Defendants knew or recklessly disregarded the fact that
the individuals did not have an asbestos-related disease and that there existed no good faith
basis in fact for the claims, making them objectively unreasonable.

149. Moreover, by retaining possession of the subject individuals' prior negative x-rays
and reads, the lawyer Defendants rendered those materials undiscoverable by CSXT during the
course of the lawsuits in which the individuals' claims were filed.

150. CSXT only obtained, and only could have obtained, the prior negative x-rays and
reads through discovery it propounded on the Peirce firm in connection with this lawsuit.
Specifically, CSXT received those materials on November 14, 2006. (*See* Receipt of Original
X-Rays (attached as Exhibit MMM).)

151. Additionally, prior to Judge Jack's June 30, 2005 opinion in the silica litigation,
CSXT did not know and could not reasonably have known that Defendant Harron intentionally
misrepresented or recklessly disregarded the contents of the x-rays he read for the lawyer
Defendants, nor did CSXT know nor could it reasonably have known that the lawyer Defendants
were aware of this practice and utilized Harron specifically because of it.

152. In short, the fabrication and prosecution of the eleven claims listed in Paragraph
147 constituted a deliberate effort by the lawyer Defendants and Harron to defraud CSXT.

33

## COUNT 1: CIVIL RICO AGAINST THE LAWYER DEFENDANTS

153.    The Plaintiff re-alleges the allegations set forth in Paragraphs 1 through 152 as if set forth verbatim herein.

154.    The Peirce firm constitutes an enterprise engaged in or the activities of which affect interstate commerce for purposes of 18 U.S.C. § 1962(c).

155.    The lawyer Defendants, who were at all relevant times employed by or associated with the Peirce firm, directly conducted and participated in the business and affairs of the Peirce firm through a pattern of racketeering in violation of 18 U.S.C. § 1962(c).

156.    Specifically, the lawyer Defendants devised and implemented a scheme to defraud CSXT and/or to obtain money by false pretenses by fabricating, filing and prosecuting objectively baseless personal injury claims, including the eleven claims described in Paragraph 147.

157.    Pursuant to the West Virginia Rules of Civil Procedure, Professional Conduct and other applicable law, by filing and prosecuting these claims, the lawyer Defendants represented to CSXT that there existed a colorable and good faith basis for the claims, when in fact they knew or recklessly disregarded that there existed no such basis and that their clients did not suffer from asbestosis.  Furthermore, the lawyer Defendants specifically intended CSXT to rely on their representations and settle the claims.

158.    In furtherance of this scheme, the lawyer Defendants repeatedly used or caused their agents to use the mails and wires, including but not limited to, the specific instances identified in Paragraphs 90, 94, 105, 112, 119, 125, 128-129, 134 and 139.

159.    Additional specific uses of the mail and wires in furtherance of the lawyer Defendants' scheme include:

   a. Letter dated August 13, 2003 from Defendant Harron addressed to Robert F. Daley regarding Morris Collier's asbestosis diagnosis. (attached as Exhibit NNN.)

34

   b. Letter dated January 4, 2005 from Defendant Peirce addressed to Fred Adkins, Esq. and Heath Wheldon. (attached as Exhibit OOO.)

   c. Letter dated June 23, 2005 from Robert F. Daley addressed to the Honorable Arthur M. Recht. (attached as Exhibit PPP.)

   d. Letter dated September 28, 2005 from Robert F. Daley to Fred Adkins, Esq. (attached as Exhibit QQQ.)

   e. Letter dated August 5, 2005 from Robert F. Daley addressed to Fred Adkins, Esq. (attached as Exhibit RRR.)

   f. Letter dated November 28, 2005 from Defendant Peirce addressed to the Honorable Arthur M. Recht. (attached as Exhibit SSS.)

   g. Letter dated November 28, 2005 from R. Scott Marshall addressed to Fred Adkins, Esq. (attached as Exhibit TTT.)

160. Each of the acts described or referred to in Paragraphs 90, 94, 105, 112, 119, 125, 128-129, 134, 139 and 159 (a-g) constitutes a violation of 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud) and is therefore a predicate act of racketeering activity under 18 U.S.C. § 1961(1).

161. These predicate acts are related in that they shared the same or similar purposes, results, participants, victims, methods of commission and were otherwise interrelated by distinguishing characteristics and were not isolated events. Specifically, each predicate act was committed in furtherance of the lawyer Defendants' deliberate scheme to fabricate asbestosis claims through their purposefully unreliable screening process, overwhelm CSXT with mass lawsuits in an overburdened court system in order to deny CSXT access to full discovery, and then defraud CSXT by prosecuting objectively baseless claims, including the eleven claims described in Paragraph 147, with the full knowledge that there existed no good faith basis in fact for those claims. The predicate acts were not isolated events, but rather

35

8:16-cv-00368-JMG-FG3   Doc # 1   Filed: 07/28/16   Page 57 of 84 - Page ID # 57
Case 5:05-cv-00202-FPS -JES   Document 841-1    Filed 07/14/11   Page 37 of 41  PageID #:
13381

regular and integral steps in furtherance of the lawyer Defendants' scheme to defraud CSXT
through objectively baseless personal injury claims.

162.     Further, the predicate acts were continuous in that they occurred on a regular
basis since 2000 and affected at least six different civil actions pending in multiple courts in
West Virginia.

163.     Accordingly, the lawyer Defendants' criminal acts of mail and wire fraud
constitute a pattern of racketeering for purposes of 18 U.S.C. §§ 1961(5) and 1962(c).

164.     Finally, although CSXT disputed the subject claims, it reasonably relied on the
lawyer Defendants' representations that the claims had some good faith basis in fact and were
brought in accordance with the West Virginia Rules of Civil Procedure, Professional Conduct
and other applicable law.

165.     By reason of the lawyer Defendants' violations of 18 U.S.C. § 1962(c), CSXT
was repeatedly injured in its business and property.  Specifically, the lawyer Defendants'
violations of § 1962(c) caused CSXT to expend substantial money and resources to process,
defend and/or settle the deliberately fabricated claims outlined in Paragraph 147 that should
never have been filed in the first place.

## COUNT 2: CIVIL RICO CONSPIRACY
## AGAINST THE LAWYER DEFENDANTS AND HARRON

166.     The Plaintiff realleges the allegations set forth in Paragraphs 1 through 165 as if
set forth verbatim herein.

167.     As outlined above, beginning in the late 1990s, the lawyer Defendants and
Harron (hereinafter collectively referred to as "the Conspirators") entered into an agreement to
conspire to violate 18 U.S.C. § 1962(c) by devising and implementing a scheme to defraud
CSXT by fabricating, filing and prosecuting objectively baseless personal injury claims against it,
including the eleven claims described in Paragraph 147.  At all relevant times, each conspirator

36

knew of and participated in this scheme through specific overt acts intended to further its objective of defrauding CSXT.

168.    Specifically, Defendants Peirce and Raimond orchestrated and implemented the screening process outlined above, which they specifically intended to attract potential clients and manufacture diagnoses of asbestos-related diseases regardless of whether the subject individuals actually exhibited signs of those diseases. (*See* Exhibit L133:11-135:23.) In furtherance of this objective, they deliberately hired technicians and doctors, including Corbitt and Harron, who they knew to be unreliable and whom they believed would maximize the likelihood of false positive diagnoses. (*See id.* at 196:23-197:3; *see also* Exhibit H 80:3-7; and Exhibit G.)

169.    Harron, in turn, agreed to read unusually high numbers of x-rays with reckless or deliberate disregard for their true content and to identify signs of asbestos-related disease where no such signs existed, with the full knowledge that the lawyer Defendants intended to file personal injury claims based solely on his B-reads. Harron further understood that the purpose of his reads were to mislead CSXT and cause it to settle objectively baseless claims.

170.    Further, the lawyer Defendants agreed that one or all of them, particularly Defendant Coulter, would cause personal injury claims to be filed based on Harron's fraudulent diagnoses. Additionally, they each agreed to assist in the prosecution of these claims through the transmission of misleading communications to clients, participation in settlement negotiations with CSXT, communications with the courts and other fraudulent means.

171.    Finally, some or all of the lawyer Defendants agreed to share the fees and settlement monies generated by the objectively baseless claims they manufactured and prosecuted. (*See* Exhibit L 24:7-25:1.)

172.    The foregoing concerted conduct by the Conspirators constitutes a violation of 18 U.S.C. § 1962(d). This violation caused CSXT to be repeatedly injured in its business or property, specifically, by forcing CSXT to expend substantial money and resources to process,

defend and/or settle the deliberately fabricated claims outlined in Paragraph 147 that should never have been filed in the first place.

## COUNT 3: COMMON LAW FRAUD AGAINST THE LAWYER DEFENDANTS

173. The Plaintiff re-alleges the allegations set forth in Paragraphs 1 through 172 as if set forth verbatim herein.

174. As previously explained, by filing or causing to be filed each of the eleven fabricated personal injury claims described in Paragraph 147, the lawyer Defendants represented to CSXT that there existed some good faith basis in fact for the claims when, in reality, they knew no such basis existed. Moreover, the lawyer Defendants specifically intended CSXT to rely on these representations and settle the claims.

175. Although CSXT disputed the subject claims, it reasonably relied on the lawyer Defendants' representations that the claims had some good faith basis in fact and were brought in accordance with the West Virginia Rules of Civil Procedure and Professional Conduct.

176. As a proximate result of the lawyer Defendants' intentional and fraudulent misrepresentations and CSXT's reasonable reliance thereon, CSXT suffered damages in the amount of the money it spent to process, defend and/or settle the fabricated claims.

## COUNT 4: CIVIL CONSPIRACY AGAINST THE LAWYER DEFENDANTS AND HARRON

177. The Plaintiff re-alleges the allegations set forth in Paragraphs 1 through 176 as if set forth verbatim herein.

178. The Conspirators agreed to combine through concerted action to unlawfully defraud CSXT as outlined in Counts 1, 2, and 3 above.

179. As a proximate result of this conduct, CSXT suffered damages in the amount of the money it spent to process, defend and/or settle the fabricated claims.

38

## COUNT 5: PUNITIVE DAMAGES AGAINST THE LAWYER DEFENDANTS AND HARRON

180.   The Plaintiff re-alleges the allegations set forth in Paragraphs 1 through 179 as if set forth verbatim herein.

181.   That the Defendants' conduct toward the Plaintiff was intentional, willful, wanton, malicious, and reckless and justifies an award of punitive damages.

WHEREFORE, Plaintiff CSX Transportation, Inc. respectfully requests:

1.   Compensatory damages jointly and severally against the Defendants in an amount sufficient to fully compensate Plaintiff for the injuries sustained as a result of Defendants' unlawful conduct, including, but not limited to, the cost, including attorneys' fees, of processing, defending and/or settling the fraudulent claims identified in Paragraph 147;

2.   Punitive damages against all Defendants in an amount sufficient to deter the Defendants and others from engaging in this conduct in the future;

3.   The court costs and attorneys' fees incurred by CSX transportation, Inc. in the preparation and prosecution of this action;

4.   Treble damages and attorneys' fees pursuant to 18 U.S.C. 1964(c); and,

5.   Any and all other further relief the Court deems just and proper.

PLAINTIFF DEMANDS A JURY TRIAL

CSX TRANSPORTATION, INC.

By_____
              Of Counsel

Marc E. Williams, Esquire
Robert L. Massie, Esquire
**Nelson Mullins Riley & Scarborough LLP**
949 Third Avenue, Suite 200
Huntington, WV 25701
(304) 526-3501 (Telephone)

39

(304) 526-3541 (Facsimile)

Samuel L. Tarry, Jr., Esquire
Mitchell K. Morris, Esquire
**McGuireWoods LLP**
One James Center
901 E. Cary Street
Richmond, VA 23219
(804) 775-1000 (Telephone)
(804) 775-1061 (Facsimile)
**COUNSEL FOR THE PLAINTIFF
CSX TRANSPORTATION, INC.**

3

Legal Research
Law Dictionaries
Law Schools
Federal Judges
Federal Courts
Federal Contracts
349 F. 3d 1253 - Deck v. Engineered Laminates
Home
Federal Reporter, Third Series
349 F.3d

# 349 F3d 1253 Deck v. Engineered Laminates

349 F.3d 1253

Brent DECK, Plaintiff-Appellant,

v.

ENGINEERED LAMINATES; Keith Illig; Elkin McCallum; KHI, Inc.; Excel Laminates, Inc.; Joan Fabrics, Inc.; Joan Automotive Industries, Inc.; Joan Laminates, Inc., Defendants-Appellees.

No. 02-3100.

United States Court of Appeals, Tenth Circuit.

November 17, 2003.

Submitted on the briefs:* Brent Deck, Pro Se.

Bill Hays, Jason E. Pepe, and Chelsi Hayden, of Shook, Hardy & Bacon, L.L.P., and Lawrence L. Ferree, III, of Ferree, Bunn, O'Brady & Rundberg, Overland Park, KS, for Defendants-Appellees.

Before HARTZ, Circuit Judge, BARRETT and BRORBY, Senior Circuit Judges.

HARTZ, Circuit Judge.

1

Plaintiff Brent Deck, proceeding pro se, appeals the district court's entry of judgment on the pleadings on his civil claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-68. We must reverse.

2

RICO provides certain advantages to plaintiffs, but it also presents substantial hurdles for plaintiffs to overcome to establish

a proper claim. Of specific concern on this appeal, RICO requires the plaintiff to prove that the defendants committed at least two predicate acts (violations of criminal statutes listed in RICO, § 1961(1)) and that the plaintiff has suffered injury to his business or property as a result of those predicate acts. Defendants have challenged whether some of the acts alleged by Plaintiff are proper RICO predicate acts and whether Plaintiff has alleged cognizable injury to his business or property.

3

We agree in part with Defendants. We hold that witness tampering in a state-court proceeding is not a RICO predicate act. We also hold that although extortion is a proper predicate act, a claim of extortion cannot be based on mere abusive litigation. On the other hand, mail fraud and wire fraud are proper predicate acts (a proposition not challenged by Defendants), and we hold that Plaintiff has adequately alleged that fraud injured his business or property. In particular, Plaintiff had a property interest in a cause of action allegedly prejudiced by the fraud; and restrictions on his competing with Defendants (which allegedly were imposed by a fraudulently induced agreement) would constitute an injury to his business. Finally, we reject Defendants' contention that Plaintiff's RICO claim must be dismissed as unripe.

BACKGROUND

4

Because the district court entered judgment on the pleadings under Fed.R.Civ.P. 12(c), we "accept[] all well-pleaded allegations in the complaint as true, and constru[e] them in the light most favorable to the plaintiff." Estes v. Wyo. Dep't of Transp., 302 F.3d 1200, 1203 (10th Cir. 2002). The complaint at issue is Plaintiff's Revised Third Amended Complaint.

5

Plaintiff is a former employee of Defendant Engineered Laminates (EL). EL was a general partnership between Joan Laminates, Inc., whose president is Elkin McCallum, and KHI, Inc., whose president is Keith Illig. Excel Laminates, Inc., Joan Fabrics, Inc., and Joan Automotive Industries, Inc., are successors, agents, or transferees of EL. Illig is the president of Excel Laminates, Inc., and McCallum is president of the other two companies.

6

After Plaintiff's employment with EL ended, Plaintiff began to compete with EL. EL sued Plaintiff in Kansas state court on the ground that he was using its proprietary trade secrets. Plaintiff counterclaimed, alleging abuse of process, fraud, and breach of contract. On December 2, 1994, the parties reached a settlement agreement, which was executed by Illig, with McCallum's authorization. Under the agreement Plaintiff released EL from his countersuit in return for payment to Plaintiff of $35,000 in five installments during the following four years. Plaintiff's complaint, although far from clear on the point, also appears to allege that the agreement restricted his ability to compete with EL. In light of our duty to construe pro se pleadings liberally, see Hunt v. Uphoff, 199 F.3d 1220, 1223 (10th Cir. 1999), we will assume that Plaintiff has made such an allegation.

7

Beginning in October 1994, EL "transferred assets, employees, associates, representatives, and business from

[EL] to Excel Laminates" and other entities owned and controlled by Illig and McCallum, R., Vol. 1, Doc. 26, at 7-8, ¶¶ 19, 22, although EL "remained in existence until September of 1998, when it had a cash value of about $70,000." Id. at 15, ¶ 52. EL defaulted on the settlement agreement in December 1997, failing to make the final two payments amounting to $15,000.

8



allegations center on the state-court action,
which Plaintiff contends was filed without a
sound basis in fact or law. He claims that
Defendants gave or suborned perjured
testimony during discovery, prolonged the
litigation, and then settled the case with the
intention of liquidating EL without its paying
Plaintiff the agreed-upon amount. He further claims that he settled in reliance on fraudulent representations by Defendants and that he performed all his duties under the settlement agreement.

9

Defendants moved for judgment on the pleadings. The district court dismissed the RICO claims with prejudice and then declined to exercise supplemental subject-matter jurisdiction over Plaintiff's state causes of action, dismissing them without prejudice. Upon Plaintiff's motion for reconsideration, the court modified its order slightly, but did not change the result. This appeal followed.

DISCUSSION

10

We review de novo a ruling on a motion for judgment on the pleadings under Fed. R.Civ.P. 12(c). As with a ruling under Fed.R.Civ.P. 12(b)(6), we uphold a dismissal "only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief." Mock v. T.G. & Y. Stores Co., 971 F.2d 522, 529 (10th Cir.1992) (internal quotation marks omitted).

11

RICO allows private parties to bring civil suits for treble damages. 18 U.S.C. § 1964(c). To state a RICO claim, a plaintiff must allege that the defendant violated the substantive RICO statute, 18 U.S.C. § 1962, by setting forth "four elements: `(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" Robbins v. Wilkie, 300 F.3d 1208, 1210 (10th Cir.2002) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). A pattern of racketeering activity must include commission of at least two predicate acts. Resolution Trust Corp. v. Stone, 998 F.2d 1534, 1543 (10th Cir.1993). Also, a plaintiff has standing

to bring a RICO claim only if he was injured in his business or property by reason of the defendant's violation of § 1962. Robbins, 300 F.3d at 1210.

12

The district court dismissed Plaintiff's RICO claims for lack of standing on the ground that he had failed to allege the requisite injury. To determine whether Plaintiff properly alleged an injury to his business or property, we first examine the alleged predicate acts that purportedly caused the injury. See Sedima, 473 U.S. at 497, 105 S.Ct. 3275 ("[T]he compensable injury necessarily is the harm caused by predicate acts...."). Plaintiff alleges as predicate acts that Defendants committed mail and wire fraud by using the United States mail and facsimile-machine transmissions to submit settlement offers and exchange a fraudulent settlement agreement, in violation of 18 U.S.C. §§ 1341, 1343. He also alleges witness tampering in connection with the state case, in violation of 18 U.S.C. § 1512; extortion through threats of prolonged, baseless litigation, in violation of 18 U.S.C. §§ 1951, 1961(1) (A); and wire fraud predicated on a defendant's false statement that EL no longer existed.

13

We must, however, disregard two of the alleged predicate acts. First, witness tampering is actionable under 18 U.S.C. § 1512 only if it takes place "in an official proceeding," which is defined in § 1515(a)(1) to include only federal proceedings. Accordingly, tampering with a witness in a state judicial proceeding, the offense that Plaintiff alleged, is not a RICO predicate act.

14

As for extortion, Plaintiff alleges no more than abusive litigation. His complaint states the following:

Interference with Commerce or Extortion

(18 USC 1951) (18 USC 1961(1)(A))

15

54. In a final meeting with [Plaintiff] after November 30, 1992, Illig threatened that, regardless of merit, Illig could "tie you up in court" if [Plaintiff] exercised his right to compete against EL rather than agree to Defendant's new contractual terms.

16

55. About April, 1993, Illig, acting through EL, brought a suit against [Plaintiff], which Illig maintained through the use of fraudulent pleadings or false testimony regarding material facts, until two years after [Plaintiff] had severed relations with Defendant.

17

56. Pleadings and testimony included known and deliberate false or misleading allegations that [Plaintiff] had entered into an oral covenant not to compete, that EL had a secret new machine design which it sought to protect, and that EL had taken customary steps to protect its alleged secrets.

18

57. Illig used force, or fear of economic harm, or color of official right, to seek or obtain [Plaintiff]'s non-competition, or services, or contractual agreement, or property.

19

R., Vol. 1, Doc. 26 at 15-16.

20

Although the alleged conduct is certainly reprehensible, it does not in itself constitute extortion under § 1951. Section 1951(b)(2) defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." We recognize that litigation can induce fear in a defendant; and it would be fair, at least in other contexts, to characterize as "wrongful" the filing of a groundless lawsuit, particularly when the plaintiff resorts to fraudulent evidence. But we join a multitude of other courts in holding that meritless litigation is not extortion under § 1951. See, e.g., United States v. Pendergraft, 297 F.3d 1198, 1208 (11th Cir.2002) ("threat to file litigation against Marion County, even if made in bad faith and supported by false affidavits, was not `wrongful'" within the meaning of term in § 1951); Vemco, Inc. v. Camardella, 23 F.3d 129, 134 (6th Cir.1994); First Pac. Bancorp, Inc. v. Bro, 847 F.2d 542, 547 (9th Cir.1988); I.S. Joseph Co., Inc. v. J. Lauritzen A/S, 751 F.2d 265, 267-68 (8th Cir.1984); Dias v. Bogins, No. 97-1612, 1998 WL 13089, at *1 (1st Cir. Jan. 13, 1998) (unpublished); G-I Holdings, Inc. v. Baron & Budd, 179 F.Supp.2d 233, 259 (S.D.N.Y.2001); Grauberger v. St. Francis Hosp., 169 F.Supp.2d 1172, 1178 (N.D.Cal. 2001); von Bulow by Auersperg v. von Bulow, 657 F.Supp. 1134, 1143-45 (S.D.N.Y.1987). But cf. Hall Am. Ctr. Assocs. Ltd. P'ship v. Dick, 726 F.Supp. 1083, 1093-97 (E.D.Mich.1989) (lawsuit was component of the extortion).

21

Extortion is the antithesis of litigation as a means of resolving disputes. To promote social stability, we encourage resort to the courts rather than resort to force and violence. Yet recognizing abusive litigation as a form of extortion would subject almost any unsuccessful lawsuit to a colorable extortion (and often a RICO) claim. Whenever an adverse verdict results from failure of the factfinder to believe some evidence presented by the plaintiff, the adverse party could contend that the plaintiff engaged in extortionate litigation. Comfortable that the adjective "wrongful" in the extortion statute was not intended to apply to litigation, we hold that Plaintiff's allegations of bad-faith litigation do not state the predicate act of extortion.

22

That leaves the mail and wire fraud allegations as the only potential RICO predicate acts pleaded by Plaintiff. The complaint describes the fraud (both mail and wire) relating to the settlement agreement as follows: Defendant Illig "made false and material representations in the form of one or more proposed settlement agreements ... promising payment over a four year period in order to induce Plaintiff into accepting the settlement agreement." R., Vol. 1, Doc. 26, at 6, ¶ 16a. Before executing the settlement agreement, Illig and Defendant McCallum had "agreed to a plan wherein they would be able to liquidate [EL] without paying its obligation to [Plaintiff]," id. at 7, ¶ 17d, and took steps to transfer assets, employees, and business from EL to Excel Laminates, id. at 7, ¶ 19. Thus, Illig and McCallum knew that EL would be unable to make payments over the four years promised in the proposed settlement agreement. Id. at 7, ¶ 20. They concealed this information from Plaintiff, id. at 8, ¶ 28, intending that he "rely upon [their] misrepresentations," id. at 8, ¶ 23. As a result, Plaintiff was "fraudulently

induc[ed]... to dismiss valid claims," id. at 9, ¶ 32b, and was damaged in an amount in excess of $50,000, id. at 8-9, ¶ 31.

23

The gist of the alleged fraud appears to be Defendants' failure to inform Plaintiff at the time of the settlement that they planned to transfer the business assets of EL to other entities they controlled, so that EL itself could not make some of the future payments called for by the settlement agreement. This is an adequate allegation of fraud. A promise to pay contains an implied representation that the promisor intends to honor the promise. Thus, one can sue for fraud when the promisor made the promise with no intent to honor it. See Roberts v. Wells Fargo AG Credit Corp., 990 F.2d 1169, 1172 (10th Cir.1993).

24

An additional wire fraud allegation is more straightforward. The complaint states that in a December 11, 1997, telephone conversation Defendant Illig falsely stated that EL no longer existed, thereby leading Plaintiff not to sue for breach of contract while EL still had assets.

25

The mail fraud and wire fraud allegations in Plaintiff's complaint are proper predicate acts. There may be a serious question whether the alleged predicate acts could support the required finding of a pattern of racketeering activity; but Defendants have not raised that issue on appeal. We therefore turn to their argument that Plaintiff failed to allege an injury to his business or property.

26

Defendants argue extensively that Plaintiff's litigation costs in the original proceeding brought in state court by EL do not constitute injuries to Plaintiff's business or property. But we need not reach that issue, because the alleged causes of those litigation costs — Defendants' alleged extortion and witness tampering — are not, as explained above, RICO predicate acts. The alleged mail fraud and wire fraud did not cause Plaintiff to incur litigation costs, so those costs are not recoverable in Plaintiff's RICO action.

27

With respect to the injuries allegedly caused by the mail and wire fraud, however, we disagree with Defendants and hold that the injuries can properly be characterized as injuries to business and property. The mail fraud allegedly caused Plaintiff to enter into a settlement to which he would not otherwise have agreed. As a result of the settlement, he relinquished claims he had against EL and agreed not to compete with EL in certain ways.

28

In our view, both these alleged consequences of the settlement were injuries to Plaintiff's business or property. The Supreme Court has held that "a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." Logan v. Zimmerman Brush Co., 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). We agree with the Third Circuit that "[a] cause of action, of course, is a form of `property,' and when it arises out of the termination of a business, we think it is not unfair to characterize conduct tending to impair it as `business injury.'" Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co., 792 F.2d 341, 354 (3d

Cir.1986). Likewise, fraud, as alleged in this case, that causes one to relinquish a cause of action arising out of his business is an injury to "business or property."

29

Plaintiff also claims a second cognizable injury resulting from the alleged fraud. If, as he asserts, the fraudulently induced settlement agreement required him to limit the extent to which he could compete with EL, then the fraud injured his "business," within the meaning of the term in RICO.

30

Although Defendants argue that Plaintiff has not adequately alleged that his injuries were proximately caused by Defendants' predicate acts, their argument does not appear to address the injuries to Plaintiff's cause of action against EL and the injury to his opportunity to compete with EL. In any event, the allegations are adequate with respect to causation of these injuries.

31

Turning to Plaintiff's additional wire fraud allegation, he alleges that the false statement that EL no longer existed caused him to forego suing for breach of the settlement agreement until EL's assets had been dissipated. This allegation adequately states a RICO claim of injury to Plaintiff's property — his contractual right to receive payments from EL.

32

Defendants respond, however, that this claim is not yet ripe and should be dismissed because Plaintiff "does not have a judgment regarding his breach of contract claim, much less any evidence that the judgment went unsatisfied." Aplee. Br. at 15. Defendants' argument might be correct if Plaintiff's only alleged injury were prejudice to his ability to collect damages for breach of contract. See Motorola Credit Corp. v. Uzan, 322 F.3d 130, 135-37 (2d Cir.2003); Lincoln House, Inc. v. Dupre, 903 F.2d 845, 847 (1st Cir.1990). But Plaintiff also alleges injury from being fraudulently induced to enter into the settlement agreement — a settlement that required him to limit his competition with EL and to dismiss his counterclaim against EL. Damages from that injury are not dependent on the Plaintiff's being unable to recover fully on his contract claim. Thus, Plaintiff's RICO claim is ripe, even though some alleged damages may be too speculative to recover before the contract claim is resolved.

CONCLUSION

33

We hold that we cannot affirm (on the grounds raised on appeal) the district court's dismissal of Plaintiff's complaint. We REVERSE the judgment below and REMAND for further proceedings consistent with this opinion.

Notes:

*

4

Metropolitan News-Enterprise

Monday, August 6, 2001

Page 1

## Court Upholds $20 Million Fraud Judgment Against Lawyer

By a MetNews Staff Writer

A racketeering conviction is determinative of civil liability to the victims of the criminal conduct, the Ninth U.S. Circuit Court of Appeals ruled Friday in upholding a judgment against a former Canoga Park attorney.

The panel affirmed a judgment awarding three major insurance companies $20 million in legal fees lost to a ring of corrupt lawyers and others who came to be known as The Alliance. The defendant, Lynn Stites, was convicted as the leader of the group and sentenced to 121/2 years in prison in 1994.

Friday's ruling came nearly six years after a different Ninth Circuit panel upheld Stites' conviction under the Racketeer Influenced and Corrupt Organizations Act. Stites resigned from the State Bar while the criminal case was pending.

The lawyers appeared together in numerous civil cases in San Diego, Orange and Los Angeles counties between 1984 to 1988. Although supposedly battling each other on behalf of individual clients, Alliance members were convicted of churning claims, enabling other members to appear on behalf of insureds who asserted their right to retain independent counsel under the Court of Appeal's 1984 decision in *San Diego Federal Credit Union v. Cumis Ins. Society, Inc*.

That decision, allowing insureds to retain their own lawyers at their insurers' expense based on the carriers' conflict of interest, was subsequently modified by statute, the Legislature declaring its intent to eliminate the kinds of abuses illustrated by the Alliance case.

Four attorneys were convicted of racketeering and fraud and four were acquitted at a 1990 trial. Stites was tried later because he was a fugitive at the time, prior to being apprehended as a result of a routine traffic stop in Illinois.

Eight lawyers and six non-lawyers—including Stites ' sister, Cheryl Dark—pled guilty before trial. Some clients were paid kickbacks for their cooperation in resisting settlements and prolonging cases, according to some of those who pled guilty.

In Friday's appeal, Judge Stephen Trott agreed with the insurers that Stites was collaterally estopped from denying the fraud. His counsel, Lawrence Schoelch of Encino, had argued that the doctrine didn't apply because the insurers were not parties to the criminal case.

The RICO Act, Schoelch noted, explicitly applies collateral estoppel where the government sues following a conviction, but is silent as to the effect of a conviction on private-party suits. The implication, Stites' lawyer argued, is that Congress intended that the doctrine not apply to suits by private parties.

Several district judges, Trott noted, have rejected similar arguments.

"We doubt that Congress intended affirmatively to deny offensive non-mutual collateral estoppel to private plaintiffs seeking to recover losses caused by RICO enterprises," the appellate jurist wrote. "The most likely explanation for the lack of an explicit statement permitting private parties to use such estoppel is simply that it was unavailable when RICO was enacted.'

The case is *Fireman's Fund Insurance Company v. Stites*, 99-56622.

*Copyright 2001, Metropolitan News Company*

## 258 F.3d 1016 (9th Cir. 2001)

## FIREMAN'S FUND INSURANCE COMPANY; ALLSTATE INS. CO., PLAINTIFFS-APPELLEES, RICHARD BANKS, ET AL., DEFENDANTS,

« up

v.

## LYNN BOYD STITES, DEFENDANT-APPELLANT.

### *No. 99-56622*

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

*Argued and Submitted June 8, 2001--Pasadena, California*
*Filed August 3, 2001*

[Copyrighted Material Omitted]

Counsel Lawrence F. Schoelch (Briefed and Argued), Law Offices of Lawrence F. Schoelch, Encino, California, for the defendant-appellant.

Ron H. Burnovski (Briefed), Robins, Kaplan, Miller & Ciresi, Los Angeles, California, for appellee Allstate Insurance Company.

Richard P. Edwards (Briefed), Mower, Koeller, Nebeker, Carlson & Haluck, San Diego, California, for appellee Fireman's Fund Insurance Company.

Curtis L. Metzgar (Briefed), Even, Crandall, Wade, Lowe & Gates, Rancho Cucamonga, California, for appellee State Farm Fire and Casualty Company.

Andrew G. Dulaney (Argued), Antioch, California, for the appellees.

Appeal from the United States District Court for the Southern District of California Jeffrey T. Miller, District Judge, Presiding D.C. No. CV-90-00389-JTM (AJB)

Before: Arthur L. Alarcon, Stephen S. Trott, and William A. Fletcher, Circuit Judges.

Opinion by Judge Trott

1    In this appeal, we must explain how the criminal and civil provisions of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO") interact, and decide under what circumstances a civil RICO plaintiff may collaterally estop a defendant from contesting the facts proven against him in a previous criminal trial. We conclude that under the specific facts of this case, an individual who has been convicted of criminal RICO violations may be held civilly liable for damages flowing from the fraudulent scheme he masterminded, even where some of those damages represent money extracted by co-defendants who were acquitted at their own criminal trials.

### BACKGROUND

2    The plaintiffs in this case are Allstate Insurance Company, Fireman's Fund Insurance Company, and State Farm Fire and Casualty Company (collectively "the Insurers"). Defendant Lynn Boyd Stites is a former attorney who has been convicted of a criminal RICO violation and numerous counts of mail fraud for his role in an organization that defrauded the plaintiffs and other insurance companies out of millions of dollars by controlling both sides of several major lawsuits in order to inflate legal fees. See United States v. Stites , 56 F.3d 1020, 1022 (9th Cir. 1995) (affirming Stites's convictions). The Insurers sued Stites under 18 U.S.C. §§ 1964, RICO's provision for civil lawsuits.

3    Stites's scheme to "churn" litigation exploited California case law holding that insurance

companies with a duty to defend their insureds must sometimes allow those insureds to select their own attorneys. See, e.g., San Diego Navy Fed. Credit Union v. Cumis Ins. Soc'y Inc., 208 Cal.Rptr 494 (Cal. Ct. App. 1984). Stites controlled a network of lawyers that was able to infiltrate both sides of several major lawsuits. Lawyers who were members of this so-called "Alliance" would ensure that plaintiffs would not settle until late in the litigation, thus enabling 'efense lawyers to accumulate substantial attorneys' fees. Through this process, as well as

« up 1rough the use of kickbacks, Stites and other members of the Alliance extracted millions of uollars from the insurance companies who had to pay the defense bills and settlements. See Stites, 56 F.3d at 1022.

4    Although Stites and many members of his "Alliance " were convicted of RICO violations and various predicate acts of mail fraud, several lawyers were acquitted of all charges. Among those acquitted were Douglas Caiafa and George Dezes. Another alleged member of the Alliance, Alan Arnold, was indicted but died before his trial.

5    After Stites's criminal convictions became final, the Insurers sought summary judgment in their civil cases against him on the ground that Stites was collaterally estopped from challenging any issue regarding his involvement in the RICO scheme. The district court agreed, and granted partial summary judgment based on collateral estoppel. The court noted that, except as to the issues of causation and damages, the elements of criminal and civil RICO were the same, but held that the Insurers had submitted inadequate documentation of their damages. The Insurers then submitted a second summary judgment motion. The court determined that the Insurers had cured the problems with the documentation of their damages, and granted summary judgment for over twenty million dollars.

6    In his response to the Insurers' second summary judgment motion, Stites argued that he could not be held liable for the fees paid to attorneys who had not been convicted of RICO charges, because the Insurers had not proved that those attorneys were members of the Alliance. Because this response was filed late, the district judge initially refused to consider it. Four months after the judgment had been entered, however, the Insurers requested that the district court consider Stites's belated response. The district court did so, and modified the judgment under Rule 60(b) of the Federal Rules of Civil Procedure.

7    In granting partial relief from the judgment, the district court assumed that the Insurers could not recover fees paid to lawyers who were not members of the Alliance. The district court then subtracted from the judgment sums attributable to the fees of attorneys whom the Insurers had not proved were connected to the Alliance. However, the court also concluded that the Insurers had submitted conclusive evidence linking the acquitted RICO defendants, Dezes and Caiafa, to the Alliance. The district judge then modified the judgment to reflect the reduced amount of damages. Stites appeals from that judgment.

DISCUSSION

A. Standard of Review

8    Although the order from which Stites appeals is an order modifying the judgment pursuant to Rule 60(b), in considering Stites's belated response to the Insurers' motion for summary judgment, the district judge considered afresh his earlier decision to grant summary judgment in favor of the Insurers. Therefore, our de novo standard of review for a district court's summary judgment decisions governs. See Balint v. Carson City, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc). The availability of collateral estoppel is an issue of law that we review de novo. See, e.g., Hydranautics v. Filmtec Corp., 204 F.3d 880, 885 (9th Cir. 2000).

B. Collateral Estoppel

9    1. Collateral Estoppel is Available to the Insurers

10   We must first address the threshold question that Stites raised in his reply brief—whether a party other than the United States may take advantage of offensive collateral estoppel in a civil RICO case. We answer this question affirmatively.

11   Title 18 U.S.C. §§ 1964(d) provides that: "[a] final judgment or decree rendered in favor of the United States in any criminal [RICO] proceeding . . . shall estop the defendant from denying

5

Valley Boys, Inc. v. State Farm Fire and Casualty Co., 8:14CV159 (D.Neb. 10/22/2014)

**2014.DNE.0000839< http://www.versuslaw.com>**

**VALLEY BOYS, INC., doing business as Valley Boys Roofing, Assignee Plaintiff,**

**v.**

**STATE FARM FIRE AND CASUALTY COMPANY, incorrectly named as;**

**No. 8:14CV159**

**United States District Court, District of Nebraska**

**October 22, 2014**

## MEMORANDUM AND ORDER

Joseph F. Bataillon Senior United States District Judge

This matter is before the court on the defendant's motion to dismiss, Filing No. 11. This is an action by an assignee for breach of contract and bad faith that was removed from state court under 28 U.S.C. §§ 1441 and 1446. Jurisdiction is premised on diversity of citizenship under 28 U.S.C. § 1332.

In its complaint, Valley Boys, Inc. d/b/a Valley Boys Roofing ("Valley") alleges that defendant State Farm Fire and Casualty Company ("State Farm" or "the Insurance Company") breached contracts of insurance with one hundred fifty-four Nebraska State Farm insureds by failing to cover hail damage to the insureds' homes. Filing No. 1, Notice of Removal, Attachment 1, Exhibit ("Ex.") 1, Complaint at 14-20. Valley further alleges that each of the insureds assigned the claims to Valley. *Id.* at 2. Also, they allege that they requested copies of the insurance policies from State Farm, but State Farm has refused to provide them. *Id.* It seeks damages in the amount of $3, 099, 249.33. *Id.* at 14. Valley also asserts a claim for bad faith and seeks attorney fees under Neb. Rev. Stat. § 44-359. *Id.* at 20-22.

Valley alleges that State Farm delayed and denied payment of the insureds' claims, which prevented the insureds from beginning or completing the necessary repairs and replacements to their homes. *Id.* at 21-22. Attached to the complaint are numerous assignments of claims.[1] *Id.*, Ex. B.

The defendant moves to dismiss for failure to state a claim for relief under Fed.R.Civ.P. 12(b)(6). State Farm argues that the plaintiffs complaint is entirely deficient in that it fails to identify the policy provision that State Farm allegedly breached and fails to identify the necessary expenses State Farm did not pay. With respect to the bad faith claims, State Farm argues that the purported assignments do not convey any right to pursue any extra-contractual claims against State Farm and does not allege any facts that amount to bad faith.

Under the Federal Rules, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 n.3. (2007). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (quoting Twombly, 550 U.S. at 555). In order to survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the plaintiff's obligation to provide the grounds for his entitlement to relief necessitates that the complaint contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

Determining whether a complaint states a plausible claim for relief is "a context-specific task" that requires the court "to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009). Under

Twombly, a court considering a motion to dismiss may begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. *Id.* Although legal conclusions "can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Courts follow a "two-pronged approach" to evaluate Rule 12(b)(6) challenges. *Id.* First, a court divides the allegations between factual and legal allegations; factual allegations should be accepted as true, but legal allegations should be disregarded. *Id.* Second, the factual allegations must be parsed for facial plausibility. *Id.*

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 677 (stating that the plausibility standard does not require a probability, but asks for more than a sheer possibility that a defendant has acted unlawfully.). The court must find "enough factual matter (taken as true) to suggest" that "discovery will reveal evidence" of the elements of the claim. Twombly, 550 U.S. at 558, 556. When the allegations in a complaint, however true, could not raise a claim of entitlement to relief, the complaint should be dismissed for failure to set a claim under Fed.R.Civ.P. 12(b)(6). Twombly, 550 U.S. at 558; Iqbal, 556 U.S. at 679.

An assignment is a transfer vesting in the assignee all of the assignor's rights in the property which is the subject of the assignment.[2] *Ehlers v. Perry,* 494 N.W.2d 325, 327 (1993). "The assignee of a thing in action may maintain an action thereon in his own name and behalf, without the name of the assignor." Neb. Rev. Stat. § 25-312; see *Eli's Inc. v. Lemen,* 591 N.W.2d 543, 552 (Neb. 1999). "'Subject to certain exceptions in case of contracts involving relations of personal confidence or trust or being for personal services all contracts are assignable.'" Eli's Inc., 591 N.W.2d at 553 (quoting 6 A C.J.S. Assignments § 29 (1975)). Actions in tort for fraud or fraudulent conveyance are similarly assignable. Eli's, Inc., 591 N.W.2d at 552-53.

"The intention of the assignor must be to transfer a present interest in the debt or fund or subject matter; if this is clearly expressed, the transaction is an assignment; otherwise not." *Tilden v. Beckmann,* 278 N.W.2d 581, 586 (Neb. 1979). Where there is no valid assignment of a particular right, the purported assignee lacks standing to bring a claim exercising that right. See Neb. Rev. Stat. § 25-301 (2006) ("Every action shall be prosecuted in the name of the real party in interest . . .").

Under Nebraska law,

> In all cases when the beneficiary or other person entitled thereto brings an action upon any type of insurance policy . . . against any company, person, or association doing business in this state, the court, upon rendering judgment against such company, person, or association, shall allow the plaintiff a reasonable sum as an attorney's fee in addition to the amount of his or her recovery, to be taxed as part of the costs.

Neb. Rev. Stat. § 44-359. When the assignor has not limited the scope of the assignment or retained any interest, the right to fees and costs under Neb. Rev. Stat. § 44-359 can be assigned along with policy rights. See, *e.g., Sherman v. Sherman,* 751 N.W.2d 168, 175 (Neb.App. 2008); accord *Gaur. Nat'l Ins. Co. v. McGuire,* 192 F.Supp.2d 1204, 1207 (D. Kan. 2002) (applying Kansas law and enforcing assignment that specifically and unequivocally transferred right to pursue certain extracontractual claims against insurer).

Under Nebraska law, in order to recover for a breach of contract, the plaintiff must prove a promise, the breach of that promise, and damages resulting from that breach. *K.M.H. v. Lutheran General Hosp.,* 431 N.W.2d 606, 608 (Neb.1988). To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract. *Gerhold Concrete Co. v. St. Paul Fire & Marine Ins.,* 695 N.W.2d 665, 672 (Neb. 2005).

An insurance policy is a contract, and its terms provide the scope of the policy's coverage. *Peterson v. Homesite Indem. Co.,* 840 N.W.2d 885, 891 (Neb. 2013). In construing an insurance contract, a court must give effect to the instrument as a whole and, if possible, to every part thereof. *Id.* Insurance contracts are construed like other contracts, according to the meaning of the terms that the parties have used. *Id.* However, "'[i]n cases of doubt, [an insurance policy] is to be liberally construed in favor of the insured.'" *Id.* (quoting *Modern Sounds & Sys., Inc. v. Federated Mut. Ins. Co.,* 262 N.W.2d 183, 186 (Neb. 1978)).

The implied covenant of good faith and fair dealing exists in every contract and requires that none of the parties to the contract do anything which will injure the right of another party to receive the benefit of the contract. *Coffey v. Planet Group, Inc.*, 845 N.W.2d 255, 262 (Neb. 2014). A violation of the covenant of good faith and fair dealing occurs only when a party violates, nullifies, or significantly impairs any benefit of the contract. *Id.* at 264. In order to establish a claim for bad faith in denial of a claim, a plaintiff must show an absence of a reasonable basis for denying the benefits of the insurance policy and the insurer's knowledge or reckless disregard of a lack of a reasonable basis for denying the claim. *Radecki v. Mut. of Omaha Ins. Co.*, 583 N.W.2d 320, 325 (Neb. 1998). Determining whether the insurer had a reasonable basis depends upon "the information available to the insurance company at the time the demand is presented." *Id.* at 326.

Nebraska recognizes the tort of first-party bad faith in connection with policies of insurance. *LeRette v. American Medical Sec, Inc.*, 705 N.W.2d 41, 47 (Neb. 2005); *Braesch v. Union Ins. Co.*, 464 N.W.2d 769 (Neb. 1991). In order to state a claim for bad faith, a plaintiff must allege an absence of a reasonable basis for denying the benefits of the insurance policy and the insurer's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. See *LeRette*, 705 N.W.2d at 47. Under Nebraska law, allegations of failure to properly investigate an insurance claim are sufficient to support a claim for the tort of bad faith. *Weatherly v. Blue Cross Blue Shield Ins. Co.*, 2 Neb.App. 669, 680-82 (Neb.App. 1994).

## DISCUSSION

The court first finds that the assignments attached to Valley's complaint appear to be valid under Nebraska law. As assignee, Valley adequately states a state-law claim for breach of contract. The breach of contract claim is premised on the allegation, assumed true at this stage of the proceedings, that the insurer failed to pay claims in accordance with the contracts of insurance at issue. The plaintiff has adequately pled the existence of a contract and the breach. State Farm has submitted an example Nebraska Homeowner's Policy with its motion to dismiss. Filing No. 13, Ex. 1, Specimen copy of State Farm Fire and Casualty Company's Nebraska Homeowners Policy form. The court's review of the 27-page document shows it to be a standard Homeowner's policy. State Farm covered losses to dwellings. Valley alleges roof damage in connection with a hailstorm. Obviously at issue are the provisions of the contract that cover repair of the dwelling. Limitations, exclusions, and definitions that pertain to the coverage, such as "similar construction" "common construction techniques and materials commonly used by the building trades, " "actual cash value, " "replacement cost, " etc., are open to interpretation. At this stage of the proceeding, the allegations are sufficient. State Farm asserts that it has no coverage for itemized charges which include pricing for overhead, operations, job site cleanup, etc. Whether such charges are necessary to complete the covered repairs is for the jury to decide. The specific claimed charges are obviously known to the parties, or can be sorted out during discovery. With respect to alleged contract deficiencies, State Farm is aware of the contracts' provisions since it drafted and issued the policies. The court finds that State Farm has been fairly apprised of the claims against it and can obtain further elucidation in discovery.

The court also finds Valley has alleged sufficient facts to state a plausible claim for bad faith. Specifically, Valley alleges that State Farm conducted incomplete, inadequate, and/or outcome-oriented investigations into the losses in order to avoid paying all benefits due; refused to consider Valley's estimates of the losses; misled the insureds and Valley with respect to the terms, conditions, and coverage under the policies for the losses; and denied coverage, delayed payment, refused to pay for the repairs and failed to recognize the assignments of the claims to Valley. These allegations are sufficient to state a claim for bad faith on behalf of the insureds under the assignments.

Further, the insureds have broadly assigned rights to the insurance claims and proceeds. The assignments are not limited to breach of contract claims and do not preclude bad faith claims or claims for statutory attorney fees. Accordingly, IT IS ORDERED that the defendant's motion to dismiss (Filing No. 11) is denied.

-------

Notes:

[1] Each assignment states that the insureds:

> transfer, assign and set over onto Valley Boys, all of the right, title and interest of the undersigned [insureds] in and to
> those certain insurance claim(s) made by [listed insured] designed under [specified claim number] covering loss
> sustained at the property known as [insured's address] during [insured's] ownership thereof, including but not limited
> to any and all insurance claims asserted thereunder and proceeds thereof.

See, e.g., Filing No. 1, Attachment 5 at 1.

[2] By way of contrast, subrogation is the substitution of a subrogee, who is not a volunteer, for a subrogor as a result of the subrogee's
payment of a debt owed to the subrogor so that the subrogee succeeds to the subrogor's right to recover the amount paid by the
subrogee. *Krohn v. Gardner,* 533 N.W.2d 95, 98 (Neb. 1995). To be entitled to subrogation, one must pay the debt for which another
is liable. *Id.* The Nebraska Supreme Court explains:

> Subrogation involves the substitution of an insurer by operation of law to the rights of the insured because of the
> insurer's pre-existing duty to pay the insured for the loss. In contrast, an assignment involves a transfer of a legal claim
> from an injured party to a volunteer who was under no pre-existing duty to compensate the injured party. Moreover,
> under subrogation an insurer's recovery is limited to the amount paid to the insured, whereas there is no such limitation
> on an assignee's recovery.

*Milbank Ins. Co. v. Henry,* 441 N.W.2d 143, 145 (Neb. 1989).

------

© VersusLaw, Inc., format, enhancements and compilation.

6

## Court Orders Misrepresentation and Churning allegations against agency and The Hartford Insurance Company can proceed

*Source: Leagle.com*
*January 5, 2010*

LYDIA SCHWEER FAMILY TRUST v. DINGLER, THE HARTFORD INSURANCE COMPANY

THE LYDIA SCHWEER FAMILY TRUST, by and through the trustee, ARLENE FUQUA, Plaintiff,
v.
ALFRED DINGLER, PRIME INSURANCE AGENCY, and THE HARTFORD INSURANCE COMPANY, Defendants.

Case No: 8:09-cv-2451-T-26MAP.

United States District Court, M.D. Florida, Tampa Division.

January 5, 2010.

### ORDER

RICHARD A. LAZZARA, District Judge.

Before the Court is Defendants Alfred Dingler and Prime Insurance Agency's Motion to Dismiss (Dkt. 5), and Plaintiff's Response and affidavit of Arlene Fuqua, the trustee of the Lydia Schweer Family Trust (the Trust). (Dkt. 10). After careful consideration of the motion and the file, the Court concludes that the motion should be denied.

### PERTINENT ALLEGATIONS

Defendant Alfred Dingler is the owner and agent of Defendant Prime Insurance Agency (Prime). Dingler, through Prime, sold Lydia Schweer a life insurance policy issued by Defendant The Hartford Insurance Company (Hartford) in 1997. The Hartford policy required an initial payment of $100,000.00 on a $455,000.00 "paid-up" policy. From 1997 through the date this action was filed in this Court, Dingler and Prime serviced the policy. At some point in 2004, Arlene Fuqua moved to Florida.

Ms. Fuqua avers that she communicated to and received communications from Dingler and Prime through written correspondence as well as telephone calls on multiple occasions after moving to Florida in 2004. She avers that she was contacted by Dingler through written correspondence that the premium had increased another $100,000.00 and that payment was due or the policy would lapse. She avers that in March 2006, Dingler accepted partial payment from the Trust, which was administered by her in Florida, in the amount of $7,993.08. The March 2006 payment represented a partial payment of the increase of $100,000.00 in the policy premium, which was triggered by Lydia Schweer's living past the actuarial life expectancy at the time she purchased the policy.

Attached to the affidavit is a letter dated August 7, 2006, from Hartford directed to Ms. Fuqua at her Florida address and copied to Dingler. The letter refers to a request for reinstatement previously made by Ms. Fuqua and it also refers to a prior letter sent to her from Hartford dated July 25, 2006. Also attached to the affidavit are other letters including a letter dated April 10, 2006, from Hartford to Dingler regarding the grace period lapsing after 61 days. Prime and Hartford terminated the policy for failure to pay the remaining premium due.

affidavit establishes that communication were made from Dingler and Prime to the Trust after Ms. Fuqua moved to Florida in 2004. In 2006, Dingler directed correspondence to Ms. Fuqua communicating the increase in the policy and demanding payment thereof or suffer a lapse in the policy. The ongoing communications with Ms. Fuqua in Florida regarding the servicing of the life insurance policy, together with the failure to advise Ms. Fuqua of the consequences of having purchased the policy, constitute commission of a tortious act in Florida for purposes of the long-arm statute.

With respect to constitutional minimum contacts and the reasonable anticipation of being haled into court in Florida, it is clear from Ms. Fuqua's affidavit that Dingler and Prime "purposefully directed" communications to Ms. Fuqua in the servicing of the policy. See Wendt, 822 So.2d at 1258 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476, 105 S.Ct. 2174, 2171, L.Ed.2d 528 (1985)). The number of communications in this case is not limited to one; the communications lasted over the course of am almost five-year period. It was reasonable for Dingler and Prime to assume that their communications would have some effect in Florida and defending this suit in Florida will not offend notions of fair play. See Madara. Consequently, this Court has personal jurisdiction over Dingler and Prime.

## MISREPRESENTATION AND CHURNING

The Court finds that count II for misrepresentation is pleaded with sufficient specificity. The complaint alleges that Dingler and Prime should have given certain advice, which they allegedly failed to do. The "agency" defendants have been described as the individual and entity responsible for the omissions.

The Court finds that the allegations in count III for churning are sufficient to survive this motion to dismiss. The complaint alleges that the intent to defraud existed at the time the policy was purchased in 1997 and certain disclosures were never made over the course of dealings between the parties. The allegations are sufficient to require an answer.

It is therefore **ORDERED AND ADJUDGED** that Defendants Alfred Dingler and Prime Insurance Agency's Motion to Dismiss (Dkt. 5) is **DENIED.** Defendants Dingler and Prime Insurance Agency shall file an answer to the Complaint within ten (10) days from the date of this order.

### DONE AND ORDERED.

1. Count IV seeks relief against Hartford for failure to supervise.

2. Establishing general, as opposed to specific, personal jurisdiction, section 48.193(2) proves "more difficult" to establish because it requires far more wide-ranging contacts. Consolidated Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286, 1292 (11th Cir. 2002); Canale v. Rubin, 20 So.3d 463, 466 (Fla.Dist.Ct.App. 2009).

3. Section 48.193(1)(b) provides jurisdiction over any person who commits a tortious act in Florida.

This copy provided by Leagle, Inc.

*Copyright © 2009 FBIC (www.badfaithinsurance.org)*

Click here to return to FBIC homepage

# PRIORITY
## ★ MAIL ★

DATE OF DELIVERY SPECIFIED*

USPS TRACKING™ INCLUDED*

INSURANCE INCLUDED*

PICKUP AVAILABLE

* Domestic only

WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.

Expected Delivery Day: 07/28/2018

USPS TRACKING NUMBER

9605 5154 4335 8208 0094 31

P S00001000014

EP14F July 2013
OD: 12.5 x 9.5

FROM:

D Christensen
710 S. 13th St #900
PHB #170, Norfolk, NE 68701

TO:

United States District Court
Nebraska, Omaha Division
Roman L. Hruska Federal Court
111 South 18th Plaza
Ste 1152
Omaha, NE 68102

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

**UNITED STATES POSTAL SERVICE®**

# PRIORITY
## ★ MAIL ★



## FLAT RATE ENVELOPE
ONE RATE ★ ANY WEIGHT*



PS00001000014

**EP14F July 2013**
**OD: 12.5 x 9.5**



**UNITED STATES**
***POSTAL SERVICE.***

* Domestic only.   ** For international shipments, the maximum weight is 4 lbs.